# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | : | |
| | : | Case No.: 1:20-cr-077 |
| Plaintiff, | : | |
| v. | : | Judge Timothy S. Black |
| | : | |
| Matthew Borges, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT MATTHEW BORGES'
## MOTION FOR DISCLOSURE OF GRAND JURY TESTIMONY

Defendant, Matthew Borges ("Borges"), through undersigned counsel, moves the Court, pursuant to Rule 6(e)(3)(E)(ii) of the Federal Rules of Criminal Procedure, for disclosure of the Grand Jury testimony of FBI Special Agent Blaine Wetzel as it relates to Borges only. Borges has a particularized need for this narrowly requested testimony because (1) "a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury" relating to Special Agent Wetzel's testimony and (2) the requested testimony is likely to be exculpatory under *Brady v. Maryland*, 373 U.S. 83 (1963). Counsel submits that there is good cause to believe that Special Agent Wetzel made materially false and misleading statements about Borges to the Grand Jury. This Motion is more fully explained in the attached memorandum in support.

1

Respectfully submitted,

*/s/ Karl H. Schneider*
Karl H. Schneider (0012881), Lead Counsel
Todd A. Long (0082296)
MCNEES WALLACE & NURICK LLC
21 East State Street, Suite 1700
Columbus, Ohio 43215
Telephone: (614) 719-2843
Facsimile: (614) 469-4653
kschneider@mcneeslaw.com
tlong@mcneeslaw.com

*Counsel for Defendant*

# MEMORANDUM IN SUPPORT

## Introduction

Borges seeks the disclosure of the Grand Jury testimony of FBI Special Agent Blaine Wetzel ("SA Wetzel"), exclusively as it relates to Borges. This narrowly structured request is material for Borges to determine whether, in fact, SA Wetzel provided false and misleading testimony concerning Borges to the Grand Jury. Borges has a good faith basis for this request because, as demonstrated below, SA Wetzel made materially false and misleading statements regarding Borges in a prior sworn statement—the July 17, 2020 Affidavit in Support of a Criminal Complaint filed in 1:20-mj-99526 ("Wetzel Affidavit").

Based on those false and misleading statements, Borges submits that disclosure of SA Wetzel's Grand Jury testimony will yield one of three alternative outcomes: (1) SA Wetzel testified falsely, but consistently with his Affidavit, as to Borges, which may constitute a ground to dismiss the Indictment; (2) SA Wetzel testified truthfully, but inconsistently with his Affidavit, as to Borges, which makes his testimony exculpatory (impeachment) evidence under *Brady*; or (3) SA Wetzel did not testify about Borges at all, which makes this motion moot. Therefore, Borges has a particularized need for its disclosure.

## Wetzel Affidavit – False and Misleading Statements[1]

SA Wetzel's false and misleading statements follow a common pattern: SA Wetzel makes a factual representation that is false or at minimum, misleading and then he draws an inference on that unfounded premise. After stacking up the false and misleading statements and

---

[1] Consistent with the Amended Protective Order (R.77), Borges will submit the "Discovery Materials" that he refers to, cites, and quotes under seal.

the unfounded premises drawn therefrom, he concludes that Borges had knowledge of the alleged unlawful plan and acted with criminal intent.

*SA Wetzel Falsely Quotes Borges*

SA Wetzel states that "For example, Borges stated '*Larry was putting the squeeze*' on Associate 3[.]'" (Wetzel Aff. at ¶ 225.) The import of that purported quote of Borges in Paragraph 225 was that Borges knew that Householder secretly controlled Generation Now. But Borges never said those words—not in any recorded conversation, text message, phone call or email. Yet, SA Wetzel states it is a quote (using quotation marks and italicized font) and ascribes it to Borges.

Both the purported quote and the resulting inference are false. This fits an apparent pattern concerning SA Wetzel's treatment of Borges throughout the affidavit.

*SA Wetzel's False Statements About Bribing CHS-1 for Inside Information*

SA Wetzel states, "As described below, Borges offered to and did pay CHS-1 to provide inside information about the Ballot Campaign such as the number of signatures collected, the number of collectors, and geographic focus of collection efforts." (Wetzel Aff. at ¶ 218.) This statement is also demonstrably false.

Given a fair reading of CHS-1's employment contract, Borges never asked for "inside information." CHS-1 provided Borges his employment contract, which was not with the Ballot Campaign but rather with a vendor hired by the Ballot Campaign. CHS-1's employer was thus known to Borges, and presumably the FBI. Contrary to the facts, both Wetzel's Affidavit and the Indictment assert that CHS-1 was "employed" by the "Ballot Campaign." (Wetzel Aff. at ¶ 218; Indictment, R.22, at PageID 1255.)

Borges requested a copy of CHS-1's employment contract on September 5, 2019, because he wanted to "[m]ake sure [CHS-1] didn't sign an NDA." (2019.09.05_1_TIER3-8159.) That was the same day CHS-1 reached out to Borges at the direction of the FBI. Text messages confirm that CHS-1 sent Borges a copy of his employment contract, and CHS-1 even tells Borges that his employment contract does not have a non-disclosure agreement ("NDA"). (2019.09.05_1_TIER3-8161.) In a subsequent conversation, Borges and CHS-1 discuss the employment contract, making clear that Borges is familiar with its terms. (2019.09.10_Audio 1_TIER3-8210 at 32:00).

Contrary to CHS-1's representation to Borges, the employment contract did have an NDA. However, Section 9, paragraph (b) of CHS-1's employment contract excludes from "Confidential Information" any information that "[i]s now or subsequently becomes generally available to the public through no wrongful act of the Employee[.]" (TIER3-US0008147.) The number of signatures gathered was going to be publicly disclosed by the referendum campaign. *See* Ohio Rev. Code §§ 3519.051 (requiring original referendum petitions to be filed with the Secretary of State or a board of elections) and 3519.14 (requiring a minimum number of signatures for acceptance of filing)[2]. In fact, the number of signatures gathered was later disclosed. See *Deadline to File to Overturn Controversial Nuclear Bailout Law a Week Away,* Ohio Public Radio, Oct. 14, 2019, https://www.wcbe.org/post/deadline-file-overturn-controversial-nuclear-bailout-law-week-away; *Group Fighting Nuclear Plant Bailout Law Seeks Extension of Repeal Effort,* Ohio Public Radio, Oct. 23, 2019, https://www.wcbe.org/post/group-fighting-nuclear-plant-bailout-law-seeks-extension-repeal-effort.

---

[2] SA Wetzel understood Ohio's referendum petition process prior to drafting his affidavit and would have been aware that the number of signatures gathered would be publicly disclosed. (Wetzel Aff. at ¶¶ 4, 187-188)

5

Despite having access to CHS-1's employment contract and knowing that Borges reviewed it over concerns regarding an NDA, SA Wetzel ignored the plain language of the contract and the inescapable conclusion that Borges was not seeking "Confidential Information" according to the terms of that contract. SA Wetzel mischaracterized the number of signatures gathered as "inside information" and falsely stated that Borges had requested information about the Ballot Campaign that he had not.

Further, Borges did not ask CHS-1 for "the number of collectors" or the "geographic focus of collection efforts" in any of the multiple recorded conversations or documented text messages. Yet, SA Wetzel claims that "when CHS 1 asked how the deal would work, Borges told CHS 1 that it would help to know locations in advance and they '*really need to know how many signatures you have*." (Wetzel Aff. at ¶ 224.) But this misrepresents what Borges said and changes his words. In fact, Borges was dismissing the offer from CHS-1 to provide information about locations. Borges actually said "I mean I guess it helps *a little* to know the locations in advance, so, you know, it saves us a little time having to follow people around, but they're gonna follow people around. The information we really need to know is how many signatures are you getting." (2019.09.10_Audio 1_TIER3-8210 at 39:39.) Borges never asked CHS-1 where signature gatherers were located nor did he ask how many there were.

Building on those false premises, SA Wetzel describes the payment made by Borges to CHS-1 as a "bribe" for that "inside information." (Wetzel Aff. at ¶ 218) ("The Enterprise attempted to obtain such information by utilizing Borges to bribe CHS-1[.]") This too is false. Borges made clear his intention was to hire CHS-1 to perform services on political projects unrelated to the HB 6 referendum issue before, during, and after making the payment.

For instance, on September 13, 2019, at 10:20 am Borges texted CHS-1 the following:

Let's do a 3 month agreement to work on political projects that I need help with, unrelated to the issue we are both working on. I'll front load it so you can deal with the issue w your daughter and get out from under that. I don't want you to undermine your campaign's efforts – we will just work on other stuff.

(2019.09.13_3_TIER3-8190.)

Regarding CHS-1's difficult personal situation, CHS-1 described it to Borges as:

CHS-1: "You know the situation I've been in the last few years. Struggling to take care of like even basic stuff."

Borges: "Yeah."

CHS-1: "So, um, well, how would this work? What do you need from me and what do I, you know like what do I get? That feels like a weird question, but what can we arrange?"

Borges: "I don't know let's sit down and discuss it again."

CHS-1: "OK. When, when are you free?"

Borges: "What happened with your lawyer – what's going on?"

CHS-1: "So, ok, so I've got my, I don't know if you know about, my child support documents they're like a court order from my divorce."

Borges: "Yeah."

CHS-1: "But I basically got, I got screwed big time. Um, when we got divorced, she had like a basically a wealthy family from Mt Vernon that was not a fan of mine. And they were like hey we'll pay all of your legal bills, run him into the ground. Um, so they outspent me, and every time they'd come back with a different suggestion relating to parenting time it was like less and less. And so basically what happened is I spent myself out of money. And I got to the end of it, and I was like I'm out of money. And my attorney said well then we go with what they submit to us next, and we agree to that and then we try to change it in court later. So, what I walked away from was paying over a thousand a month in child support, getting [his daughter] from 10am to 6pm every other Saturday. That's it. The day after every holiday. And that's my time with her. So, I wanted to change that for a while. And I met with an attorney up in Knox County for the cases and basically just told her like listen I just want standard minimum parenting hours, every other full weekend, alternating holidays, but the biggest thing, and this is what really freaks me out, her mom is remarried and she's about to graduate from her PhD program at OSU. And when she graduates, they've been talking about listing their house on the market so

7

| | |
|---|---|
| | she can interview for jobs. And she's had interviews in New York and California, and the other part of the order from the court says that she can leave the state of Ohio without any consent from me or anyone else. Like they can just go. Um, which is also not normal, and I don't want" |
| Borges: | "No, that's not normal." |
| CHS-1: | "And I don't want my kid to move out of state. And so, um, so the attorney was like well I mean the parenting schedule, like all of that, that's easy cause it's already standard minimum. She's like but they're going to fight really hard on that out of state thing because that's her career. That's her move. And I was like, yeah that's fair." |
| Borges: | "So, their plan is to move out of state?" |
| CHS-1: | "Right. Well, they're gonna try. Like she's, she's interviewing everywhere. And I think they kind of want to get out of Ohio and she's going to pop any day, she's got a baby on the way. And, um, and so my thought is I want to get it taken care of before she graduates. But doing that, like fast tracking the whole process, I have a really good attorney, but really good attorneys are really expensive. And so for me it's like I need to get this underway and get things filed. And I started his whole thing when I was at DPS with Motorcycle Ohio and was like 'oh this won't be a problem at all' I was going to pay this off and now, obviously I can't. So, I'm just kind of stuck. So I met with the attorney again and was just like what can we do? And she was like we've gotta have, we've gotta have the money up front first cause that's my retainer and then if they assign a guardian ad litem like you might pay more for a guardian ad litem than you even do for me. So it's just, I don't know which way it's gonna go. But just to even get things started I mean it costs money. No attorney is going to anything for free unless they're like your best friend." |

(2019.09.05(3:25PM)_TIER3-8135 at 4:15-8:29.)

During that same conversation, Borges told CHS-1 that he thought it might be best for CHS-1 to leave his current job in two weeks, a suggestion that CHS-1 dismissed as "weird." (2019.09.05(3:25PM)_TIER3-8135 at 10:47.) In a call later that same day, September 5, 2019, Borges reiterated that he wanted to help CHS-1 and do so in a lawful manner:

| | |
|---|---|
| Borges: | "What we'd probably need to do to make everything…Do you have an employment contract with these guys?" |
| CHS-1: | "I do." |

8

| | |
|---|---|
| Borges: | "OK. In order to make it appropriate and legal we probably would have to buy your contract out. Do you have a non-disclosure agreement with these guys?" |
| CHS-1: | "That's what I don't know. I didn't sign anything specific like that, but it was like basic employment stuff and an agreement not to talk to the media and stuff like that." |
| Borges: | "If you can be bought out and you can, you have a non-disclosure agreement that you would not violate, then, this isn't like, This isn't like [redacted] sending you on a goose chase to try to get me to agree to something that then they can call the paper and say, you know, we're bribing your employees." |
| CHS-1: | "I wish any of this was that exciting, but you know how many times I've talked to [redacted] in the last 5 years – once. And it was like 2 weeks ago we had coffee." |
| Borges: | "Yeah." |
| CHS-1: | "No, and I think, honestly, that [redacted] is so un accessible, and I would love to talk to [redacted] more, and explain like, hey this is what I think we should be doing, but he's not accessible. If I need him, I have to contact him via email and met once for coffee. And we ended up talking about the OEC stuff…. |
| Borges: | "Yeah. Cause, it just better not be that." |
| CHS-1: | "No, I get that. And you have to understand that like I'm riding in the back window of my car at all time is my Matt Borges New England Patriots Super Bowl hat, like that's, I get it. |
| Borges: | "Yeah. That would be bad for both of us if a story like that came out, but it would be worse for you." |
| CHS-1: | "Right. No, I understand that." |
| Borges: | "Alright, um, sorry, you creeped me out when you called me a little bit ago. I'm gonna think about this for a little bit. I'll get back in touch with you." |
| CHS-1: | "Alright, just let me know." |

(2019.09.05(4:34PM)_TIER3-8136 at 1:27-3:34.)

9

Borges made it clear to CHS-1 that he did not want CHS-1 to do anything that would undermine his employer's or the ballot campaign's efforts. (2019.09.05(3:25PM) TIER3-8135 at 3:12) (Borges: "I'm not asking you to sabotage their effort, I'm not asking you to be a spy, I'm not asking you any of that kind of stuff. … To the extent that there's this notion that, I don't know, you're spying or selling your soul or something like that, I just didn't see it that way."))

As discussed above, Borges obtained and reviewed CHS-1's employment contract to address his concerns about an NDA and a non-compete. Borges even advised CHS-1 about what was in that contract and again urged CHS-1 to take a different job to avoid the appearance of a conflict. (2019.09.10_Audio 1_TIER3-8210 at 32:00-35:40) (Borges advising CHS-1 that "the best thing for you might be to leave" because he had signed an NDA and a non-compete and discussing different potential "options" for moving forward.) Ultimately, Borges made it clear that the project he was hiring CHS-1 to work on was separate from their current projects.

| | |
|---|---|
| Borges: | "So I've got a Kasich reunion thing that I need to pull together that I'm going to do for Judi French." |
| CHS-1: | "Uh-huh." |
| Borges: | "Of course, I committed to it and I'm never going to have time for it, you know" |
| CHS-1: | "Right" |
| Borges: | "And it doesn't have to happen like tomorrow or anything like that so, stuff like that that I'm committing to that, I need, I could use help with." |
| CHS-1: | "Okay" |
| Borges: | "I could use your help with that." |
| CHS-1: | "Alright, that's fine" |
| Borges: | "I just can't, you know." |
| CHS-1: | "Right" |
| Borges: | "I feel, I feel terrible for what you are going through with your kid and I just want to make sure you're in a place of paying your child support." |

| | |
|---|---|
| CHS-1: | "No, I get it, I understand that, and I appreciate it." |

***

| | |
|---|---|
| Borges: | "Yeah, the best way for you and I, in case there is ever any question, is that you're an independent contractor" |
| CHS-1: | "Right" |
| Borges: | "And you can work on whatever you want, we are making sure this is totally separate and quite frankly I do need some help on this stuff" |
| CHS-1: | "Right" |
| Borges: | "So, it's not immediate I don't need you to start working on it tomorrow, but I do want you to take care of the issues that you've got" |
| CHS-1: | "Right" |
| Borges: | "So" |
| CHS-1: | "I knew that" |
| Borges: | "Um and uh you know if I get a call from Randy Ludlow about this, I'm going to blow your house up" |
| CHS-1: | "You don't have to worry about that, just plant like a small nuclear reactor somewhere in the basement" |
| Borges: | [laughter] |
| CHS-1: | "And you've probably got a bunch of those in the trunk" |
| Borges: | "You know what, I you know after watching this whole shit show for the last week, I just thought to myself, let these fuckers burn each other up, you know? Like" |
| CHS-1: | "Right" |
| Borges: | "I don't need, I don't care where everyone is going every day, I don't care" |
| CHS-1: | "Right" |

(2019.09.13_Audio 1_TIER3-8214 at 26:28-27:00; 31:00-31:58).

In that same meeting, Borges reiterates that he really does need the help on the other political projects that he doesn't have time for and that he wants CHS-1 to be able to take care of his financial issues with his child. (2019.09.13_Audio 1_TIER3-8214 at 34:13-35:00.) CHS-1 later publicly confirmed that he believed he was being hired to work on political projects when

11

he made the agreement with Borges and accepted the payment for his services.

https://www.cleveland.com/open/2020/07/meet-the-man-who-helped-the-fbi-expose-ohio-house-speaker-larry-householders-alleged-60m-bribery-scheme.html.

Attempting to paint the actual agreement between Borges and CHS-1 as nothing more than a ruse, SA Wetzel claims that "Borges never again mentioned CHS-1 performing any specific work unrelated to the Ballot Campaign." (Wetzel Aff. at ¶ 226.) That is misleading, if not false. During a recorded telephone call, CHS-1 asks Borges "[i]s there anything you need from me?" (2019.10.21(8:20PM)_TIER3-8140 at 7:22.)[3] Borges responds, "yeah, things have just gotten so wild that I haven't been able to focus on those other projects. Let's get past the twenty first and then dig into some of that stuff." *Id.* Similarly, in a later conversation, Borges said, "Look, at the end of the day, you and I sat down and we talked about working on a different project together. You had specific, you know, concerns in your personal life, that somebody who has done business with you in the past, you know, was willing to hire you to help you kind of manage. We decided to put those things off until after this effort was over." (2019.09.21(3:39PM) at 17:27-17:46.)

SA Wetzel's conclusion, that Borges bribed CHS-1 for inside information, is false. It is also material because the Government seeks to characterize Borges' payment to CHS-1 as a predicate act of racketeering activity.

*SA Wetzel's False and Misleading Statements About Borges, Householder and Generation Now*

SA Wetzel states, "Recorded statements by Borges to CHS-1 also show Householder's use of Generation Now…" (Wetzel Aff. at ¶ 55.) In the next paragraph, SA Wetzel states

---

[3] Borges submits that this recording is mis-labeled and was made on October 11, 2019, not October 21, 2019.

"Borges also discussed Householder's direct involvement in managing Generation Now." (Wetzel Aff. at ¶ 56.) Neither statement is true. Borges never said that Householder was involved in Generation Now, and Borges did not say anything about Householder and his relationship to Generation Now.

In the next paragraph, SA Wetzel suggests that Borges was aware that Householder was personally profiting from the alleged bribery scheme, and misrepresents Borges words, stating: "Borges indicated that he was not aware of what Householder was making off the relationship with Company A[.]" (Wetzel Aff. at ¶ 57.) In fact, CHS-1 asked Borges "What do you think [Householder's] making off this?" (2019.09.13_Audio 1_TIER3-8214 at 41:16.) Borges responds, "Off what? Oh. I'm not aware of anything like that. I'm really not." *Id.*

Building on those false and misleading statements, SA Wetzel concludes that, "Householder's admissions confirm Clark's and Borges' statements that Householder controls Generation Now." (Wetzel Aff. at ¶ 59.) But Borges never said, nor implied, that Household controls Generation Now.

These false statements are material because they go to Borges' alleged knowledge of the alleged unlawful plan, elements of a RICO conspiracy.

## Argument

Generally, a party seeking disclosure of grand jury material under Rule 6(e) of the Federal Rules of Criminal Procedure must demonstrate a particularized need. *See Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 228 (1979). More specifically, Rule 6(e)(3)(E)(ii) allows a district court to disclose a grand-jury matter "at the request of a defendant who shows that a ground *may* exist to dismiss the indictment because of a matter that occurred before the grand jury[.]" (emphasis added.)

Borges submits that there "may" exist a ground to dismiss the Indictment if materially false and misleading testimony was presented to the Grand Jury. In *United States v. Basurto*, the Ninth Circuit held that

> the Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached. Whenever the prosecutor learns of any perjury committed before the grand jury, he is under a duty to immediately inform the court and opposing counsel—and, if the perjury may be material, also the grand jury—in order that appropriate action may be taken."

497 F.2d 781, 785-86 (9th Cir. 1974); *contra United States v. Adamo,* 742 F.2d 927, 939-42 (6th Cir. 1984) (agreeing with *Basurto* that prosecutors cannot knowingly use perjured testimony at any point in the prosecution of a case but declining to require a prosecutor to seek a superseding indictment upon learning of material perjury before the grand jury or risk dismissal).

As demonstrated above, SA Wetzel made numerous false and misleading statements about material facts in his sworn affidavit. Borges has a good faith basis to believe that SA Wetzel made similar false and misleading statements to the Grand Jury based on allegations made in the Indictment. *See, e.g.,* Indictment, R.22, at ¶ 67 (alleging that Borges confirmed Householder's management of Generation Now), and ¶¶ 125-127 (alleging that Borges bribed CHS-1 for inside information).

Alternatively, Borges has a particularized need to obtain *Brady* material, which SA Wetzel's Grand Jury testimony almost assuredly is given the false and misleading statements in his Affidavit. The government may claim that even if SA Wetzel's Grand Jury testimony is relevant for impeachment purposes, that disclosure is limited by the Jencks Act. However, the Sixth Circuit has held that the Jencks Act does not limit the Court's authority to order the pretrial disclosure of grand jury testimony. *See United States v. Short,* 671 F.2d 178, 185-86 (6th Cir. 1982) (holding that the "Jencks Act does not apply to a motion for pretrial disclosure of a grand

14

jury transcript. … [t]he discretion of the trial judge and the requirement of a showing of 'particularized need' still govern" such motions).

## Conclusion

Borges has demonstrated a particularized need to obtain the narrowly requested Grand Jury materials as they *may* support a later motion to dismiss the Indictment and likely are *Brady* material. The Court should grant this motion and order the disclosure of FBI Special Agent Blaine Wetzel's Grand Jury testimony, exclusively as it relates to Borges.

Respectfully submitted,

*/s/ Karl H. Schneider*
Karl H. Schneider (0012881), Lead Counsel
Todd A. Long (0082296)
MCNEES WALLACE & NURICK LLC
21 East State Street, Suite 1700
Columbus, Ohio 43215
Telephone: (614) 719-2843
Facsimile: (614) 469-4653
kschneider@mcneeslaw.com
tlong@mcneeslaw.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Motion was electronically filed with the Clerk of the United States District Court using the CM/ECF system on October 21, 2021, which will send notification of such filing to all attorneys of record including Assistant United States Attorneys Emily Glatfelter and Matthew Singer.

*/s/ Karl H. Schneider*
Karl H. Schneider (0012881), Lead Counsel