## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CASE NO. 1:20-CR-77** |
| **Plaintiff,** | : | |
| | : | **JUDGE BLACK** |
| **v.** | : | |
| | : | **GOVERNMENT RESPONSE TO** |
| **LARRY HOUSEHOLDER, et al.,** | : | **DEFENDANT BORGES' MOTION** |
| | : | **FOR DISCLOSURE OF GRAND JURY** |
| **Defendants.** | : | **TESTIMONY** |
| | : | |
| | : | |

The United States respectfully submits this response in opposition to Defendant Matthew Borges' Motion for Disclosure of Grand Jury Testimony. (Doc. 93 (PageID 1612)). In response, the government asserts that the Court should deny the Defendant's motion for the reasons set forth in the following memorandum.

Respectfully submitted,

VIPAL J. PATEL
Acting United States Attorney


*/s Matthew C. Singer*
EMILY N. GLATFELTER (0075576)
MATTHEW C. SINGER (IL 6297632)
Assistant United States Attorneys
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Office: (513) 684-3711
Fax: (513) 684-6385
Email: Matthew.Singer@usdoj.gov
E-mail: Emily.Glatfelter@usdoj.gov

## MEMORANDUM OF LAW

Defendant Borges' seeks release of a grand jury transcript—but the justifications he provides in support fail.  Specifically, the motion claims the complaint affidavit is false or misleading—it is neither.  The affiant's reasonable inferences and conclusions are supported by the record and corroborated throughout the affidavit.  The motion claims grand jury testimony "may" provide a ground for dismissing the Indictment—it does not.  Courts have held this type of speculative assertion insufficient to show particularized need, as required.  Finally, the motion cites only a single case in support—it has been expressly rejected by this Circuit.  Rather, established law, ignored by the Defendant, forecloses his claim.  The motion should be denied.

### I.      PROCEDURAL HISTORY

On July 17, 2020, Magistrate Judge Bowman signed a complaint finding probable cause that Defendants Matthew Borges, Larry Householder, Neil Clark, Juan Cespedes, Jeff Longstreth, and Generation Now conspired to participate in an enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).  (Doc. 5 (Complaint)).  The complaint was supported by an affidavit signed by FBI Special Agent Wetzel.  On July 30, 2020, the grand jury returned an indictment against the same individuals and entity, for the same charge.  (Doc. 22 (Indictment)).

Defendant Borges now seeks disclosure of the grand jury testimony so, as he claims, he can "determine whether, in fact, SA Wetzel provided false and misleading testimony concerning Borges to the Grand Jury."  (Doc. 93 at PageID 1614.)  In support, Borges cites eight paragraphs from the affidavit (out of 249) relevant to his "knowledge and criminal intent," and concludes, disclosure of the grand jury transcript "may constitute a ground to dismiss the Indictment," or may make his grand jury testimony "exculpatory impeachment evidence under *Brady*."  (*Id*.; *see also id*. at 1625.)

The motion—wrong on both the facts and the law—should be denied.

1

## II.    LEGAL STANDARD

Grand jury secrecy is a central tenant of federal criminal investigations.  As the Supreme Court explained, "[w]e consistently have recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 218 (1979).  As a result, "[i]t has long been recognized that grand juries require a generous zone of secrecy in order to perform their investigative functions." *In re Grand Jury Subpoenas*, 454 F.3d 511, 521 (6th Cir. 2006).

Rule 6(e) sets forth the grounds under which grand jury materials may be disclosed.  Relevant here, a court may authorize disclosure of grand jury materials "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(i)–(ii).  But the Supreme Court has "consistently construed the Rule . . . to require a strong showing of particularized need for grand jury materials before any disclosure will be permitted." *United States v. Sells Eng'g, Inc*., 463 U.S. 418, 443 (1983). Particularized need requires a party show "(a) the material sought will prevent a possible injustice, (b) the need for disclosure outweighs the need for secrecy, and (c) the request is narrowly tailored to provide only material so needed." *Fed. Deposit Ins. Corp. v. Ernst & Whinney*, 921 F.2d 83, 86 (6th Cir. 1990) (citing *Douglas Oil*, 441 U.S. at 222–23).  In balancing a party's disclosure interest against the public's interest secrecy, the Supreme Court explained:

> . . . the courts must consider not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries. Persons called upon to testify will consider the likelihood that their testimony may one day be disclosed to outside parties. Fear of future retribution or social stigma may act as powerful deterrents to those who would come forward and aid the grand jury in the performance of its duties. . . . Thus, the interests in grand jury secrecy, although reduced, are not eliminated merely because the grand jury has ended its activities.

*Id.* at 222. The Defendant bears the burden of showing "compelling necessity" for grand jury materials based on "particularized need." *United States v. Rankin*, 2017 WL 3319259, at *4 (S.D. Ohio Aug. 2, 2017); *United States v. Cook*, 2019 WL 2067142, at *3 (S.D. Ohio May 10, 2019).

## III. ARGUMENT

Defendant's motion fails for three independent reasons: (A) the statements by the affiant are neither false nor misleading; (B) the Defendant's claim that grand jury materials "may" support a possible motion to dismiss fails to show particularized need; and (C) the Defendant may not challenge the grand jury's determination that Borges violated § 1962(d)—this is the purpose of trial.

### A. Statements in the Complaint Affidavit Are Not False or Misleading

The Defendant broadly claims that because the complaint affidavit is false and misleading, disclosure of Grand Jury testimony may reveal false testimony. This argument fails because the eight assertions in the affidavit cited by the Defendant—paragraphs 55, 56, 57, 59, 218, 224, 225, and 226—*are neither false nor misleading*. (Doc. 93 at PageID 1615–24.) Rather, the affiant's statements are reasonable inferences and conclusions based on the Defendant's statements, corroborated throughout the detailed affidavit.

"[W]hile an affidavit must state facts supporting an independent judicial determination that the informant is reliable, those facts need not take any particular form." *United States v. McCraven*, 401 F.3d 693, 697 (6th Cir. 2005); *United States v. Kubaryk*, 2015 WL 6396033, at *4 (N.D. Ga. Oct. 22, 2015) ("An affiant is allowed to summarize objective evidence from an investigation"). Indeed, "a law enforcement officer may rely on his training and experience to draw inferences and make deductions that might well elude an untrained person." *United States v. Pacheco*, 841 F.3d 384, 396 (6th Cir. 2016) (quoting *Texas v. Brown*, 460 U.S. 730, 746 (1983) (Powell J., concurring)). "[A]n experienced agent is [also] permitted to draw reasonable inferences and interpretations of statements

3

in the context of a series of conversations and events." *United States v. Collins*, 972 F.2d 1385, 1411 (5th Cir. 1992). The process of agents establishing probable cause "leaves ample room for reasonable inferences based on common experience: an affidavit submitted to show probable cause need not point to some straight-line connection but, rather, may rely on the affiant's connecting of a series of dots in a commonsense way." *United States v. Adams*, 971 F.3d 22, 32 (1st Cir. 2020). This is precisely what the affiant does here.

### 1. <u>Affidavit Paragraphs 55, 56, 57, and 59</u>

Paragraphs 49 through 65 of the affidavit are contained in a section titled, "Householder's Control of Generation Now." This section starts by detailing recorded conversations in which Neil Clark explains, "*<u>Generation Now is the Speaker's (c)(4)</u>, that's the one I work for*" (paragraph 50); Householder "*appointed*" Clark to be "'*the overseer*' of Generation Now" (paragraph 51); and the money in Generation Now is "*unlimited*," and Clark "*spent close to $20 million in the last eight weeks*" (paragraph 51). This section followed detailed facts showing the roughly $60 million that passed from Company A to Generation Now bank accounts (paragraphs 47, 48). Together, these paragraphs thus present facts showing that Company A funded Generation Now, and Householder used and controlled the Company A money that went into Generation Now.

The paragraphs that follow—which include paragraphs that are the subject of the Defendant's motions—corroborate this evidence through statements from Defendant Borges.

**Paragraph 55.** Far from false or misleading, the affidavit's statement in paragraph 55 that "Recorded statements by Borges to CHS 1 also show Householder's use of Generation Now, and further confirm Clark's statements,"[1] is a reasonable conclusion based on Borges' cited statements:

- Paragraph 55 details how Borges received $1.62 million from Generation Now while working to further the House Bill 6 effort on behalf of "*this fucking company*," which he

---

[1] The language in this paragraph challenged by the Defendant is not contained in the Indictment.

confirmed was "Company A."  Borges thus received Company A money passed through Householder-controlled Generation Now.  Borges then characterized Householder's relationship with Company A as an "*unholy alliance between Larry, [Company A] and [Borges' firm]*," in which Householder was "*helping with the issue our single largest client cares a lot about*"—the House Bill 6 nuclear subsidies.

- Paragraph 56, Borges describes how Generation Now's public relations spokesperson wanted to quit working for Generation Now "*so bad*" because the work was damaging his reputation but "*can't because the Speaker won't let him*."

- Paragraph 57 involved a follow-up exchange about Householder "*putting the squeeze on*" Generation Now's spokesperson in which Borges responded, "*Larry thinks this stuff is good for us*"—showing Householder and Borges aligned as to Generation Now's efforts.

- Paragraph 58 details Borges' statement that Clark was "*acting as [Householder's] proxy*" to Generation Now during meetings.

These statements by Borges support the reasonable conclusion that Householder "*used*" Generation Now money to pay Borges to further the HB 6 effort as part of the "*unholy alliance*" between Company A, Householder, and Borges's firm, which corroborate Clark's statements about Generation Now; and that Householder "*used*" Generation Now for his purposes, by controlling employment decisions and assigning Clark as his proxy for Generation Now.

Paragraph 56.  Similarly, the statement that "Borges also discussed Householder's direct involvement in managing Generation Now," is a reasonable conclusion—Householder was directly involved in *managing* Generation Now by not allowing Generation Now's spokesperson to quit (paragraph 56) and assigning Clark to be his "proxy" to Generation Now in meetings when Householder was absent (paragraph 58).  The latter statement was corroborated by Clark in paragraph 51:  "*we have a meeting on Friday, he's going to be in the room, so I'll be just like everyone else, I'll be, I'll be another fucking staffer.  When he's out of the room, I'm the guy*."

Paragraph 57.  The Defendant's motion claims Paragraph 57 "misrepresents Borges [sic] words."  (Doc. 93 at PageID 1624.)  Not so.  According to the affidavit, Borges stated "he was not

5

aware of what Householder was making off the relationship with Company"[2] but was aware that others were profiting (paragraph 57). Contrary to the motion's claim, this statement does not somehow suggest *the opposite of what it actually says*, that Borges "was aware" that Householder was personally profiting off of the alleged bribery scheme. (Doc. 93 at PageID 1624.)

**Paragraph 59.** Finally, paragraph 59 states that "Householder's admissions confirm Clark's and Borges' statements that Householder controls Generation Now."[3] Again, like paragraph 55, this is not false or misleading: Householder's recorded statements, as detailed in paragraphs 59 to 62, show Householder soliciting money into his 501(c)(4) and discussing "Gen Now" with Longstreth, corroborating Clark's statements that Householder controlled Generation Now. These paragraphs also corroborate Borges' statements identified above, which, again, suggest: Borges received $1.62 million from Generation Now and was aligned with Householder and Generation Now; Householder controlled employment decisions for Generation Now; and Householder assigned Clark to act on his behalf in Generation Now's efforts, all of which support Householder's control of Generation Now.

These paragraphs were neither false nor misleading. Rather, they are reasonable inferences and conclusions supported by facts in the affidavit. *See United States v. Powell*, 2010 WL 3476080, at *9 (E.D. Mich. Sept. 2, 2010) ("the affiant's conclusion—an opinion based on the facts that were set forth in the paragraphs preceding that opinion— . . . is merely an opinion and cannot legitimately be characterized as false or misleading.").

### 2. **Affidavit Paragraph 218, 224, 225, and 226**.

Paragraphs 216 through 228 are contained in a section of the affidavit titled, "The Enterprise Bribes an Employee of Ballot Initiative for Inside Information." This section starts in paragraph 216 by the affiant stating:

---

[2] The language in this paragraph challenged by the Defendant is not contained in the Indictment.
[3] The language in this paragraph challenged by the Defendant is not contained in the Indictment.

Based on my training, experience, and the investigation in this case, in order defeat the Ballot Campaign and ensure HB 6 went into effect in October 2019, the Enterprise would benefit from real-time information about how successful the signature collection effort was in order to best allocate their resources. However, the investigation revealed that the Enterprise's own daily, internal estimates about the signature collection were not adding up to the numbers claimed by the ballot initiative proponents.

This conclusion was corroborated by Clark, as set forth in paragraph 217, which details how the Enterprise would "[e]very day send out a crew of 235 people and we survey 2600 sites," and "do a report estimating how many signatures they've done." The purpose was to calculate the number of signatures the Ballot Campaign was collecting based on "how many signatures do you think you can collect in an hour," and "how many can you collect in a shift." Clark indicated the Enterprise was having difficulty determining the Ballot Campaign's progress collecting signatures.

The affidavit had previously detailed steps taken by the Enterprise to defeat the Ballot Campaign. For example, paragraph 198 stated that Company A wired approximately $38 million to Generation Now during this period to defeat the Ballot Campaign. The affidavit detailed how the Enterprise used Front Company to purchase advertisements (paragraphs 199–208), paid to conflict out signature collection firms (paragraphs 209–15), and paid the Ballot Campaign's signature collectors to stop collecting signatures and provide inside information to help defeat the campaign (paragraphs 229–47). These facts show why Borges sought information that would prevent the Ballot Campaign from gathering signatures to put HB 6 on the ballot for a public vote.

In paragraph 218, the affidavit stated, "As described below, Borges offered to and did pay CHS 1 to provide inside information about the Ballot Campaign such as the number of signatures collected, the number of collectors, and geographic focus of collection efforts." The affidavit explained that "CHS 1 was employed by Ballot Campaign in its efforts to repeal HB 6 through a ballot initiative," and CHS 1 reached out to the FBI after Borges's solicitation in early September.

7

In paragraphs 219 to 223, the affidavit lays out facts showing the initial bribe offer for inside information—none of which the Defendant cited in his motion.  Paragraphs 219 and 220 state:

219.     On or about September 1, 2019, Borges contacted CHS 1 and, during a meeting the next day, offered a substantial amount of money for inside information that Borges would use for his client to defeat the referendum campaign.  Specifically, according to CHS 1, Borges offered that if CHS 1 provided inside information, Borges would provide CHS 1 with monetary payments, a job, or agree to pay CHS's debts.  Borges further indicated that others are getting "fat" off the HB 6 issue, so they might as well benefit, too.  Then Borges asked CHS 1 to think about the offer and get back to him.  Borges initially reached out to CHS 1 just two days after the Ohio Attorney General approved the ballot language and just weeks after Generation Now wired over a million dollars of Company A money to Borges' LLC, 17 Consulting.

220.     In a text message following the meeting, CHS 1 told Borges he could not accept the bribe payment.  These text messages were provided to me.  Specifically, CHS 1 told Borges, "*I've thought about it.  I don't need overnight*."  CHS 1 went on:  "*At the beginning of this I thought I could walk my information into Larry's office and sell it for enough to retire on.*'" CHS 1 continued, he "*would LOVE to have those wiped out, to be debt free, and not to have to worry… but, I can't put a price tag on my integrity or my word*."  CHS 1 explained that he could not "*sell this team down the river*," concluding:  "*So.  It may not land me in the car, house, job, or financial situation I want to be in – but I couldn't face myself if I did anything but work for this and do it honestly*."  Borges responded that he understood, but made clear his intent:  "<u>*No matter what – don't ever tell anyone about our conversation from earlier*</u>."

These paragraphs—which, again, were ignored in Defendant's motion—make clear that, on September 2, 2019, Borges offered payment for inside information, a quid pro quo exchange.  This was corroborated by the CHS's response, which indicated that the requested information was important enough that CHS 1 could demand a substantial payment, but that CHS 1 preferred to proceed "*honestly*" and declined Borges' offer.  Borges' response was also telling, as to the nature of his offer and his intent—he instructed the CHS to not tell anyone about their conversation.

The illegal offer outlined in paragraphs 219 and 220 is corroborated by the paragraphs that follow and provides context to the communications cited in the Defendant's motion.  Paragraph 221 explains that after CHS 1 reconnected with Borges at FBI's direction and expressed interest in Borges' offer, Borges followed up asking for CHS's employment contract and stating, "*I'll make an offer to buy you out.  It will be substantial*."  When asked, "*What will a buyout entail*?" Borges replied, "*Give*

8

*me a day or two to figure this out*." Borges then started soliciting CHS 1 for inside information about Ballot Campaign, texting, "*Have you guys started door to door?*" Borges then texted, "*Any idea what the count looks like? Just want to nail down the opportunity we discussed*"—again, tying information to payment. CHS 1 responded that he "*should have access to some of that tonight/tomorrow*" but continued, "*don't want to share too much without some guarantee I'm not gonna get fucked. Not you – just trying to be careful on this*." Borges replied: "*Yep, I can get this done. They just want to know they have the right source. So a data point will help me get it finalized*." In a later exchange, in paragraph 223, Borges and CHS 1 set a time to meet in person and Borges stated, "*I've gotten more clarity. Protects you*." In another, Borges texted, "*I promise this will be worth your while*."

In paragraph 224, the affiant details CHS 1's September 10, 2019 meeting with Borges. After discussing the payment to CHS 1, the CHS asked Borges how the deal would work, and Borges replied they "*really need to know how many signatures you have*," which was consistent with his intent to receive signature information in return for payment.[4] Borges then confirmed he was working for Company A and that Householder, Company A, and Borges' firm formed an "*unholy alliance*" and were working together to defeat the Ballot Campaign (paragraph 55)—the same effort CHS 1 was employed to further.

Paragraph 225 details the September 13, 2019 meeting in which Borges gave a $15,000 check to CHS 1, which was funded entirely by Company A-to-Generation-Now money. The affiant states, contrary to prior communications, that Borges represented that the money was his own, that no one

---

[4] Statements not included in the affidavit support this. For example, Borges advised CHS 1: "you're just going to stay [with your current employer], and you're just going to tell me. And I'm just going to pay you in a private transaction." Borges then stated he would make "a fifteen thousand dollar payment now and a ten thousand payment when it's over." Borges continued, "people are going to get fat off of this. . . . So why the fuck not us." Borges also set up his cover story. He described CHS 1 providing information through a phone call because "there's never any record . . . and, uh, then I'm not hiring you, and I'm not, I'm helping you out in a personal situation you need help with, because I'm your friend."

knew about the transaction, and that it was for CHS 1's help planning a reunion.  Nevertheless, when he gave the money to the CHS, Borges stated he wanted to know the statewide number.[5]  And Borges then threatened to "blow up" the CHS's house if the information got out.  Although CHS 1 treated this threat as a joke, Borges never stated it was.

Paragraph 226 explains that after Borges paid the $15,000, Borges sought inside information relating to the Ballot Campaign's signature collection efforts on multiple occasions.  Borges never mentioned CHS 1 performing any "specific work unrelated to the Ballot Campaign," as referenced in the September 13 meeting.

These facts support the affiant's reasonable conclusion that Borges offered and paid a bribe for inside information relating to the Ballot Campaign.  Yet, the Defendant argues that certain statements in the above paragraphs are false or misleading.  Each claim is meritless.

**Paragraph 218**.  *First*, the Defendant asserts that he never sought "inside information" on the ground that the number of signatures collected is not "confidential information" in CHS's contract because it would ultimately be made public.  (Doc. 93 at 1615–17.)  But the information Borges sought—*e.g.*, the Ballot Campaign's progress collecting signatures—was not public when the corrupt offer was made.  Rather, Borges sought *real-time, non-public information* relating to the Ballot Campaign's progress gathering signatures, known internally to the Ballot Campaign, but not the Enterprise.  Knowing that information in September—well before the October deadline for finalizing signatures—allowed the Enterprise to spend its "unlimited" resources (which totaled $38 million in less than four months) to prevent the Ballot Campaign from succeeding, including buying out Ballot Campaign's signature collectors.  By the time the actual signatures became public in October, it may have been too late for the Enterprise to take action to prevent the Ballot Campaign from collecting

---

[5] Multiple times during the September 13 meeting Borges asked for the number of signatures collected.

the necessary signatures. Thus, whether the signatures were "confidential information" under the contract is irrelevant. What matters is Borges offered money to induce CHS 1 to violate his duty to his employer, which would harm the employer's efforts to collect enough signatures to put the referendum language on the ballot, the purpose for which they were hired. [6]

*Second*, the Defendant argues that the affidavit is false because CHS 1 was not actually "employed" by the Ballot Campaign. (Doc. 93 at 1615.) This misreads the affidavit. Paragraph 16 defined the term "Ballot Campaign" broadly, as "a campaign . . . to organize a statewide ballot-initiative referendum" to overturn the legislation. CHS 1's employer was hired to be part of that campaign, and CHS 1 was hired by his employer to further the Ballot Campaign's efforts. The affidavit thus accurately states CHS 1 was "employed" by the broadly-defined Ballot Campaign.

*Third*, Borges argues none of the "multiple recorded conversations or documented text messages" support the affiant's statement that Borges asked CHS 1 for "the number of collectors" or the "geographic focus of collection efforts."[7] (Doc. 93 at 1617.) Not true. Paragraph 224 documents the September 10 call in which Borges asked whether CHS 1 "had access to the statewide number or only his region"—*i.e.*, "the geographic focus of collection efforts." Further, the affiant had access to other communications not cited in the affidavit and properly relied on this evidence in drawing his conclusions. *See Kubaryk*, 2015 WL 6396033, at *4 ("An affiant is allowed to summarize objective evidence from an investigation"). For example, on September 10, Borges asked whether CHS 1 knew "the total count for the state, or you just know your region?" Borges also asked about the signature count in the non-Columbus regions on September 13. In a September 19 recorded call, Borges and CHS 1 discussed the number of signature collectors.[8] Borges stated, "we're hearing you guys are

---

[6] For example, the employment contract, which the Defendant reviewed, precluded CHS 1 from pursuing business opportunities that conflict with the employer's business.

[7] This language in paragraph 218 challenged by the Defendant is not contained in the Indictment.

[8] This call was produced in discovery and was included in the materials submitted with the Defendant's motion.

bringing in a whole bunch of people from out of state, is that true?"  Borges then asked about a rumor that "they were going to hire hundreds of people, but didn't know if that was the plan or not."  The "people" would be hired to collect signatures.  CHS 1 stated he would have more information on Friday.  Borges asked, "Do you know what your region looks like?" relating to the number of signature collectors in CHS 1's region.  Borges then stated, "if you know something on Friday let me know, that would be really, really helpful for us to know."  The affiant's statements were thus correct.

*Finally*, Borges argues that the affiant falsely concluded  that Borges' payment to CHS 1 was a "bribe."  (Doc. 93 at PageID 1617–23.)  As the above makes clear, the affidavit shows ample probable cause that Borges intended to offer and pay a bribe, including:  CHS 1's report, corroborated by follow-up communications, that Borges offered CHS 1 money on September 2 for inside information that Borges would use to defeat the Ballot Campaign (paragraphs 219–20)—paragraphs not addressed in the Defendant's motion; Borges texted that he will "*make an offer*" that "*will be substantial*" but, "*they want to know they have the right source*" and requested a "*data point*," like "*what the count looks like*" so he could "*nail down the opportunity we discussed*" (paragraphs 221– 22); the September 10 meeting in which Borges discussed paying money for what they "*really need to know how many signatures you have*"—a bribe offer; the payment of money on September 13 that originated from Generation Now while making clear Borges wanted CHS 1 to tell him the number of signatures collected, despite his alternate explanation for the payment; subsequent, repeated requests for that same inside information while, conversely, never asking CHS 1 to perform any work on any other project in exchange for the $15,000, suggesting Borges' alternate excuse for the payment was a false exculpatory[9]; and, indicative of his true intent, Borges repeatedly instructed CHS 1 not to let anyone know about their arrangement, including:  "no matter what – don't ever tell anyone about our

---

[9] Borges stated at the September 10 meeting that he was concerned CHS 1 was going to tape their subsequent conversations after the initial meeting.

conversation from earlier," and Borges threatened to "blow your house up" if contacted about the payment.[10]  If the transaction was for an unrelated project, Borges would have no reason to hide the exchange or threaten the CHS.  *United States v. McNair*, 605 F.3d 1152, 1197 (11th Cir. 2010) ("[T]he extent to which the parties went to conceal their bribes is powerful evidence of their corrupt intent.").

These facts support the affiant's reasonable conclusion that Borges offered and paid a bribe. The affiant's conclusion based on these facts cannot be challenged as somehow false or misleading *See Powell*, 2010 WL 3476080, at *9 ("The affiant's conclusion is merely an opinion and cannot legitimately be characterized as false or misleading.").  In any case, the magistrate judge, then the grand jury, independently determined probable cause based on the facts presented.  *United States v. Gunter*, 551 F.3d 472, 480 (6th Cir. 2009).

**Paragraph 224.**  Borges argues the affiant "misrepresents" and "changes his words" in paragraph 224.  (Doc. 93 at 1617.)  Simply not true.  Borges stated:  "I guess it helps *a little* to know the locations in advance" because it saves them "a little time."  (*Id*.) (emphasis in original).  Borges went on to state, "The information we really need  to know is how many signatures are you getting." (*Id*.)  The affidavit did not quote the entire exchange.  Paragraph 224 paraphrased the first part of Borges statement, while quoting the material part of the conversation:  "Borges told CHS 1 that it would help to know locations in advance and they '*really need to know how many signatures you have*.'"[11]  This is not a misstatement; Borges *did state* that knowing locations would help, and the affiant properly emphasized Borges' quoted language, what they "*really need to know*"—how many signatures the Ballot Campaign was collecting.

---

[10] Borges repeated in both the September 10 and the September 13 meetings that it would be "bad" if news of the transaction came out.  In fact, in the September 10 meeting, Borges stated, although he did not think the transaction was improper, if news of it came out, "I'd fucking trash you . . . whatever came out it would be bad for me.  It'd be worse for you."

[11] The language in this paragraph challenged by the Defendant is not contained in the Indictment.

13

**Paragraph 225**. Borges argues he never stated, "*Larry was putting the squeeze on Associate 3*" as set forth in paragraph 225.[12] (Doc. 93 at 1615.) As detailed above, paragraphs 56 and 57 of the affidavit accurately quoted the exchange:

> 56.    Borges also discussed Householder's direct involvement in managing Generation Now. Specifically, on September 13, 2019, he stated the following about Associate 3, who is Generation Now's public relations spokesperson:
>
>> *Like [Associate 3] who has to, who has to, answer to the press obviously, he wants to quit so bad 'cause he's like "this is my reputation now" you know . . . but he can't because the Speaker won't let him, but he god he hates this shit.*
>
> 57.    When CHS 1 asked whether Householder was "*putting the squeeze on [Associate 3]*," Borges responded that, "*Larry thinks that this stuff is good for us.*" . . . .

Paragraph 225 simply repeated the initial quote in paragraph 57 but attributed it to Borges instead of CHS. What is clear is that Borges implicitly agreed with the statement through his response. This type of immaterial omission—correctly stated earlier in the affidavit (paragraph 57)—is irrelevant to the probable cause determination. *See United States v. Watson*, 498 F.3d 429, 434 (6th Cir. 2007) ("a minor, unintentional drafting oversight . . . unapparent by even a close read, let alone 'a simple glance'" and unnoticed by the agent or magistrate judge who issued the warrant, is not subject to exclusion). Indeed, the exchanges in paragraphs 56 and 57 support the purpose for the challenged quote's inclusion in paragraph 225: that Borges' statements show Householder's involvement in the Enterprise, a fact supported by ample evidence in the affidavit.

**Paragraph 226**. Borges states the affiant "is misleading, if not false" by stating, "Borges never again mentioned CHS 1 performing any specific work unrelated to the Ballot Campaign."[13] (Doc. 93 at 1623.) In support, the Defendant cites vague, *non-specific* references to "other projects" and "a different project" that Borges asked the CHS to help with after signature efforts ended on

---

[12] The language in this paragraph challenged by the Defendant is not contained in the Indictment.
[13] The language in this paragraph challenged by the Defendant is not contained in the Indictment.

October 21, 2019. (*Id.*) But Borges never brought the issue up again—he never asked CHS 1 for *specific help* with any "reunion" or any other "*specific work* unrelated to the Ballot Campaign" after paying the $15,000. In fact, he never asked anything of CHS 1 in exchange for the $15,000—aside from information relating to the signature collection efforts, the same reason Borges offered the payment on September 2. Paragraph 226 is accurate, and Borges' contrary clam is false.

The Defendant's claim that the affiant made false or misleading statements has no merit and, therefore, provides no basis for disclosure of grand jury material.

**B. The Defendant Fails to Show Particularized Need for the Grand Jury.**

The Defendant's claim that "there 'may' exist a ground to dismiss if materially false and misleading testimony was presented to the grand jury" also fails under Rule 6(e). (Doc. 93 at 1625.)

Courts regularly deny requests for grand jury materials based on the generalized claim that they "*may contain* relevant and/or exculpatory evidence." *United States v. Dimora*, 836 F. Supp. 2d 534, 553 (N.D. Ohio 2011) (emphasis in original) (denying motion on these grounds). In *United States v. Washam*, the defendant sought grand jury transcripts alleging an agent "committed perjury before the grand jury," and he needed the transcripts "to support his dismissal of the Indictment." 2007 WL 1166005, at *1 (W.D. Ky. Apr. 17, 2007). The court found this "insufficient to obtain the disclosure of [not previously produced] grand jury transcripts under Rule 6(e)" because "[a] 'generalized desire' to inspect the grand jury transcripts in the hopes that evidence beneficial to the defendant will be discovered does not satisfy the particularized need requirement." *Id.* at *2; *see also Rankin*, 2017 WL 3319259, at *4 (rejecting motion because "conjecture" that grand jury "depended upon . . . falsified evidence in their determination to indict" not particularized); *United States v. Ressler*, 2007 WL 602210, at *6 (N.D. Ga. Feb. 16, 2007) ("particularized need is not shown by a general allegation that grand jury materials are necessary for the preparation of a motion to dismiss.").

Here, the Defendant's only support for his general claim that transcripts "may" help a potential motion to dismiss the Indictment are his allegations relating to the complaint. As set forth above, those paragraphs are not false or misleading. Yet, even if the Defendant's claims were true—which they are not—six of the eight paragraphs in the affidavit (paragraphs 55, 57, 59, 224, 225, 226) *are not even referenced in the Indictment*. The two paragraphs relevant to the Defendant's motion (affidavit paragraphs 56 and 218) that are generally referenced in the Indictment relate to Householder's management of Generation Now and Defendant Borges' offer to bribe the CHS. (*See* Doc. 93 at 1625 (citing Indictment ¶ 67 (relating to Generation Now's management) and Indictment ¶¶ 125–27 (relating to Borges' bribing CHS)). But these paragraphs simply recite the affiant's conclusions based on the facts, and these statements are not subject to challenge. *Powell*, 2010 WL 3476080, at *9. In any case, as detailed in the Indictment, Householder's management of Generation Now is supported by both Borges' statements and statements by others, including Householder himself. (*See* Doc. 22 ¶¶ 63–74.) And paragraphs 125 to 127 of the Indictment include facts establishing that Borges bribed the CHS that are not challenged in the Defendant's motion here (Indictment ¶ 125), along with facts not even cited in the affidavit. (*Id.* ¶ 127.) As the above cases show, the Defendant's speculative claim that "there 'may' exist" a ground to dismiss *the Indictment* based on statements in the *complaint affidavit* fails to provide particularized need.

Further, the Defendant's attempt to challenge the facts by arguing he lacked intent to bribe fails to show particularized need. Questions of fact, including a defendant's intent, are not grounds for dismissing an indictment. *United States v. Lee*, 919 F.3d 340, 349 (6th Cir. 2019) ("indictment must be read as a whole, accepting the factual allegations as true"); *McCormick v. United States*, 500 U.S. 257, 270 (1991) ("matters of intent are for the jury to consider."). Indeed, in the context of a bribe, the petit jury must assess intent to engage in a quid pro quo "based on words, conduct, acts,

16

and all the surrounding circumstances." *United States v. Terry*, 707 F.3d 607, 614 (6th Cir. 2013); *see Lee*, 919 F.3d at 357 (although defendant stated, "'I'm not trying to influence you . . . I'm trying to make you think,' . . . a juror could easily have heard those words and concluded that they meant the exact opposite"). Thus, fact issues are not grounds for accessing grand jury materials because "[f]actual disputes and defenses, including those Defendant seeks to put before the Court through the evidence attached to its Motion, should be resolved by the finder of fact." *United States v. Kight*, 2020 WL 2050665, at *4 (N.D. Ga. Mar. 16, 2020); *United States v. Snyder*, 2018 WL 2289578, at *6 (N.D. Ohio May 18, 2018) (finding "a factual dispute" relating to the evidence "does not show a need for disclosure of the grand jury transcripts"); *Dimora,* 836 F. Supp. 2d at 548 (the "theory of the defense that these were really innocent encounters . . . would be for the jury, as fact finder").

### C. The Defendant May Not Challenge the Grand Jury's Finding

Finally, the Defendant seeks the grand jury material to determine whether he has a ground to move for dismissal of the Indictment. (Doc. 93 at 1614, 1625.) But courts are clear: a defendant may not challenge the grand jury's findings through a motion to dismiss.

"An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956). "[T]he grand jury's singular role in finding the probable cause necessary to initiate a prosecution," precludes "looking into and revising" the grand jury's judgment. *Kaley v. United States*, 134 S.Ct. 1090, 1097 (2014). Thus, defendants may not move to dismiss an indictment on the ground that: they "have a right to testify or to have exculpatory evidence presented," *United States v. Williams*, 504 U.S. 36, 52 (1992); "the grand jury acted on the basis of inadequate or incompetent evidence," *United States v. Calandra*, 414 U.S. 338, 345 (1974); the "evidence itself is unreliable" as presented to the grand jury, *Williams*, 504 U.S. at 54–55; or the

indictment "is not supported by sufficient evidence," *United States v. Levin*, 973 F.2d 463, 468, n.2 (6th Cir. 1992). "Courts and counsel may not indulge in such speculation . . . that the grand jury would not have returned an indictment if the evidence, both testimonial and documentary, . . . had not been presented to the grand jury." *United States v. Adamo*, 742 F.2d 927, 938 (6th Cir. 1984) (rejecting claim indictment was defective because evidence later found "inaccurate, erroneous, or . . . . at least partially fraudulent"). "[I]t would run counter to the whole history of the grand jury institution' to permit an indictment to be challenged on the ground that there was inadequate or incompetent evidence before the grand jury." *Williams*, 504 U.S. at 54 (internal quotations omitted).

Motions to dismiss an indictment based on alleged perjury before the grand jury similarly fail. In *Bracy v. United States*, Justice Rehnquist denied an application to stay enforcement of a criminal judgment on the basis of alleged perjury before the grand jury: "The grand jury does not sit to determine the truth of the charges brought against a defendant, but only to determine whether there is probable cause to believe them true, so as to require him to stand his trial," citing *Costello* and *Calandra* in support. 435 U.S. 1301, 1302 (1978). "While the presentation of inadmissible evidence at trial may pose a substantial threat to the integrity of that factfinding process, its introduction before the grand jury poses no such threat." *Id.*; *see Adamo*, 742 F.2d at 939–41 (rejecting claim government must dismiss indictment where perjured testimony presented to grand jury), *United States v. Sims-Robertson*, 16 F.3d 1223, at *6 (6th Cir. 1994) (rejecting claim rights were violated by presentation of "false testimony to the grand jury" because "the prosecution may determine whether to allow an indictment to stand when perjured testimony is presented to the grand jury"); *Anderson v. Secretary for Dep't of Corr.*, 462 F.3d 1319, 1327 (11th Cir.2006) ("an indictment is not invalidated by the grand jury's consideration of perjured testimony").

18

Here, the government *did not present perjured testimony to the grand jury*. As established above, none of the statements cited in the Defendant's motion are "false or misleading," much less in a way that is material to the Indictment. The Defendant does not even attempt to show the statements in the affidavit are material to the Indictment. In any event, the Defendant cannot show any actual prejudice—as set forth above, six of the eight challenged affidavit paragraphs are not in the Indictment, and the other two are well-supported conclusions. Nor does Defendant argue that the grand jury was not "legally constituted" or "biased"—the sole bases for challenging the Indictment. *Costello*, 350 U.S. at 363; *United States v. Short*, 671 F.2d 178, 182 (6th Cir. 1982).

Of course, if the affiant testifies, the Defendant will receive the grand jury transcript pursuant to the Jencks Act. *See* 18 U.S.C. § 3500; *Short*, 671 F.2d at 187. But, contrary to the Defendant's claim (Doc. 93 at 1625), a desire for early Jencks materials for purposes of impeachment does not satisfy the Defendant's burden to show particularized need. *United States v. Mays*, 2021 WL 781400, at *2 (N.D. Ohio Mar. 1, 2021) (denying request for early Jencks disclosure of grand jury testimony based on defense's theory that officers account was inaccurate for failure to show particularized need); *United States v. Maike*, 2020 WL 3066624, at *1 (W.D. Ky. June 9, 2020) ("need[ing] the material to understand the specific evidence facing him and to properly impeach the Government's evidence are insufficient to obtain the disclosure of the grand jury transcripts under Rule 6(e)"); *see also United States v. Scott-Emuakpor*, 2000 WL 288443, at *11 (W.D. Mich. Jan. 25, 2000).

Rather than addressing this established case law, the Defendant's only support for his motion is a Ninth Circuit case *that has been expressly rejected by the Sixth Circuit*. The Defendant cites *United States v. Basurto*—block quoted for emphasis—for the claim that a prosecutor who learns of material perjury before the grand jury must take "appropriate action," *i.e.*, dismissal of the Indictment. (Doc. 93 at 1625 (quoting *Basurto*, 497 F.2d 781, 785–86 (9th Cir. 1974))). But, as the defense knows

19

(based on the subsequent citation in the motion), the Sixth Circuit expressly rejected this holding in *Adamo*, leaving no legal support for any hypothetical motion to dismiss. *See Adamo*, 742 F.2d at 940–42 (disagreeing with holding in *Basurto* and rejecting claim that perjured testimony required dismissal of indictment); *Sims-Robertson*, 16 F.3d 1223, at *6 (citing *Adamo* as "rejecting the Ninth Circuit rule requiring the prosecution to correct erroneous testimony before the grand jury"). Rather, consistent with the law above, "an indictment returned by a legally constituted and unbiased jury cannot be challenged." *Sims-Robertson*, 16 F.3d 1223, at *6 (citing *Calandra*, 414 U.S. at 345).

Despite no legal or factual support, the defense claims "a good faith basis" for presenting this motion. (Doc. 93 at 1625.) Quite the opposite. The defense relied solely on a case rejected by this Circuit, and ignored authority that precluded his claim, as a means to lodge serious and unfounded claims against the FBI Special Agent and the government by implication, relating to conclusory language that was, for the most part, *not even in the Indictment*. Indeed, the defense offered no good faith basis for even asserting that the eight paragraphs cited were materially "false or misleading"[14]— the affiant simply drew reasonable inferences and conclusions based on Borges's own words, which are not subject to challenge at this stage. The Defendant's claims have no merit.

## IV. CONCLUSION

The Defendant's motion for grand jury material should be denied.

---

[14] Most troubling, on February 4, 2021 and March 2, 2021, Borges participated in proffer-protected interviews with government agents. His current defense counsel was present at both. The proffer agreement protected his statements during the interviews unless, among other things, he subsequently took a position inconsistent with what he told agents during the interviews. This is precisely what was done in this motion. Relevant here, Borges admitted to FBI agents during the March 2 interview that he paid CHS 1 for information relating to CHS 1's efforts with the referendum. Similarly, during the February 4 interview, Borges stated to FBI agents that the purpose of the payment was to pay CHS 1 for information regarding how many signatures the opposition collected so Borges could share this information with a co-defendant and members of his team. He now somehow claims that the affiant made a false statement *by drawing the same conclusion in the complaint affidavit*—that Borges intended to pay the CHS for information relating to the Ballot Campaign. (*See, e.g.,* Doc. 93 at 1617 (arguing the affiant's description of the payment to CHS 1 as a "bribe" is false because "Borges made clear his intention was to hire CHS-1 to perform services on political projects unrelated to the HB 6 referendum issue before, during, and after making the payment.")).

Respectfully submitted,

VIPAL J. PATEL
Acting United States Attorney


*/s Matthew C. Singer*
EMILY N. GLATFELTER (0075576)
MATTHEW C. SINGER (IL 6297632)
Assistant United States Attorneys
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Office: (513) 684-3711
Fax: (513) 684-6385
Email: Matthew.Singer@usdoj.gov
E-mail: Emily.Glatfelter@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was filed with the Court's CM/ECF System this 12th day

of November 2021, which provides electronic notice to all parties.

*s/ Matthew C. Singer*
MATTHEW C. SINGER (IL 6297632)
Assistant United States Attorney
