# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CASE NO. 1:20-CR-77** |
| **Plaintiff,** | : | |
| **v.** | : | **JUDGE BLACK** |
| | : | |
| **LARRY HOUSEHOLDER, et al.,** | : | **GOVERNMENT RESPONSE TO** |
| | : | **DEFENDANT BORGES' MOTION TO** |
| **Defendants.** | : | **STRIKE SURPLUSAGE FROM** |
| | : | **INDICTMENT** |
| | : | |
| | : | |

The United States respectfully submits this response in opposition to Defendant Matthew Borges'
Motion to Strike Surplusage from Indictment. (Doc. 104 at PageID 1734.) In response, the government
asserts that the Court should deny the Defendant's motion for the reasons set forth in the following
memorandum.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney


*s/ Emily N. Glatfelter*
EMILY N. GLATFELTER (0075576)
MATTHEW C. SINGER (IL 6297632)
Assistant United States Attorneys
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Office: (513) 684-3711
Fax: (513) 684-6385
Email: Matthew.Singer@usdoj.gov
E-mail: Emily.Glatfelter@usdoj.gov

## MEMORANDUM OF LAW

Defendant Borges moves to strike allegations supporting the private honest services and Travel Act predicates. Specifically, Borges asks the Court to weigh allegations in the Indictment and strike the honest services predicates as unconstitutionally vague; and he argues the Travel Act predicates are overbroad because they do not meet the definition of "generic" bribery and violate federalism principles because the challenged conduct involves only minor, intrastate activity.

But these arguments are contrary to law. The government presents its evidence at trial, not in an Indictment; and the jury assesses that trial evidence based on all the facts and surrounding circumstances. Regardless, the Indictment alleges that the Enterprise conspired to bribe employees of the Ballot Campaign to breach their fiduciary duties to the campaign—a non-vague application of the honest services statute. In addition, the conduct underlying the Travel Act predicates meets both the definition of generic bribery and the elements of the relevant Ohio statute. Further, the Travel Act was enacted to address this specific type of conduct—intrastate activity involving state law commercial bribery using a facility in interstate commerce. The motion should be denied.

## I. RELEVANT BACKGROUND

The grand jury charged the Defendants with conspiring to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering ("RICO") activity that consisted of multiple acts indictable under 18 U.S.C. §§ 1343, 1346; 18 U.S.C. § 1951; 18 U.S.C. § 1952; 18 U.S.C. § 1956; 18 U.S.C. § 1957; and chargeable under Ohio Revised Code § 2921.02. (Doc. 22, ¶ 33.) The RICO predicates indictable under § 1346, the honest services wire fraud statute, allege public official honest services fraud (*i.e.*, public-official bribery) and private honest services fraud (*i.e.*, private-sector bribery). The Travel Act predicates allege acts indictable under § 1952 through Ohio Revised Code § 3517.22(a)(2).

1

In his motion, Defendant Borges seeks to strike allegations relating to the private honest services and Travel Act predicates. For the reasons set forth below, the motion fails.

## II.    LEGAL STANDARD

Federal Rule of Criminal Procedure 7(d) provides that, "[u]pon the defendant's motion, the court may strike surplusage from the indictment or information." Fed. R. Crim. P. 7(d). Rule 7(d) "has been strictly construed against striking surplusage." *United States v. Kemper*, 503 F.2d 327, 329 (6th Cir. 1974). "A court should grant a motion to strike surplusage 'only where it is clear that the language is irrelevant and prejudicial.'" *United States v. Ledbetter*, 2015 WL 5029249, at *1 (S.D. Ohio Aug. 26, 2015) (quoting *United States v. Neller*, 229 F.3d 1154, at *2 (6th Cir. Aug. 25, 2000)). "The determinative question in a motion to strike is not the potential prejudice the defendant might face but, rather, the relevance of the allegation to the crime charged in the indictment." *Id.* at *1 (citing *United States v. Moss*, 9 F.3d 543, 550 (6th Cir. 1993)). Indeed, "if the language in the indictment is information which the government hopes to properly prove at trial, it cannot be considered surplusage no matter how prejudicial it may be (provided, of course, it is legally relevant)." *Moss*, 9 F.3d at 550 (internal quotation marks omitted).

Although styled a motion to strike surplusage, Borges essentially seeks to dismiss from the Indictment the private honest services and Travel Act predicates. To be constitutionally sufficient, an indictment must: "(1) 'set out all of the elements of the charged offense and must give notice to the defendant of the charges he faces,' and (2) '[be] sufficiently specific to enable the defendant to plead double jeopardy in a subsequent proceeding, if charged with the same crime based on the same facts.'" *United States v. Kuehne*, 547 F.3d 667, 696 (6th Cir. 2008) (quoting *United States v. Douglas*, 398 F.3d 407, 411 (6th Cir. 2005)). Under this standard, an Indictment is sufficient if it "set forth all the elements necessary to constitute the offence intended to be punished," along

with a general description of the "facts and circumstances as will inform the accused of the specific offence." *United States v. Lee*, 919 F.3d 340, 349 (6th Cir. 2019) (quoting *Hamling v. United States*, 418 U.S. 87, 117–18 (1974)); *United States v. Stepanets*, 879 F.3d 367, 372–73 (1st Cir. 2018) ("[T]he indictment gives the defendants enough info to prepare a defense and to invoke double-jeopardy protections to forestall a later trial on the same charges. The law requires no more."). The indictment must be read "as a whole, accepting the factual allegations as true, and construing those allegations in a practical sense with all the necessary implications." *United States v. McAuliffe*, 490 F.3d 526, 531 (6th Cir. 2007).

## III.    ARGUMENT

### A.  Private Honest Services Predicates Are Properly Plead and Should Not Be Stricken.

Defendant Borges argues that the private sector honest services predicates are vague as applied in the Indictment. But this argument is premature. As explained below, a vagueness challenge must be assessed based on all the evidence presented at trial, not just allegations in a pleading.[1] In addition, the argument fails because the Indictment sufficiently alleges a conspiracy scheme to bribe employees and agents of the Ballot Campaign to defeat the campaign's efforts.

### 1.  The Private Honest Services Fraud Standard.

The Supreme Court's decision in *Skilling v. United States* informs the legal standard applicable to private honest services fraud. In *Skilling*, the Supreme Court held that the honest services statute, 18 U.S.C. § 1346, is not vague when charged as bribery or kickback schemes. 561 U.S. 358, 401 (2010). This is true in the context of both public-official honest services fraud

---

[1] The government's response to Defendant Householder's motion to dismiss sets forth the standard for pleading a racketeering conspiracy. (*See* Doc. 112 (citing standard for pleading a *Glecier* conspiracy). As set forth in the government's response, under this standard, the indictment need only allege the elements of a racketeering conspiracy and does not need to specify the predicate or racketeering acts defendants agreed to commit. The government adopts that case law here, which further shows that Borges' motion to strike should be denied as premature.

and private-sector honest services fraud. *Id*. Indeed, the Court explained, courts have long recognized that "a recreant employee—public or private—c[ould] be prosecuted under [the wire-fraud statute] if he breache[d] his allegiance to his employer by accepting bribes or kickbacks in the course of his employment." *Id*. (internal quotation marks omitted). In the context of private honest services fraud:

> When one tampers with [the employer-employee] relationship for the purpose of causing the employee to breach his duty [to his employer,] he in effect is defrauding the employer of a lawful right. The actual deception that is practised is in the continued representation of the employee to the employer that he is honest and loyal to the employer's interests.

*Id*. (quoting *United States v. Procter & Gamble Co.*, 47 F. Supp. 676, 678 (D. Mass. 1942)). The Court explained, "[a]s to fair notice, whatever the school of thought concerning the scope and meaning of § 1346, it has always been as plain as a pikestaff that bribes and kickbacks constitute honest-services fraud." *Id*. at 412 (internal quotation marks omitted). Thus, "[a] criminal defendant who participated in a bribery or kickback scheme, in short, cannot tenably complain about prosecution under § 1346 on vagueness grounds." *Id*. at 413.

The Sixth Circuit set forth the standard for a private honest services bribery scheme in *United States v. Frost*. In *Frost*, two professors were charged with depriving a university of their honest services by helping students obtain fraudulent degrees in return for aid receiving government contracts for the professors—a quid pro quo, "degrees-for-contracts," bribery scheme.[2] 125 F.3d 346, 353 (6th Cir. 1997). In affirming the convictions, the Court explained, "the concept of 'property' refers to a 'bundle of rights' which includes the rights to possess, use, exclude, profit, and dispose"; and the university had "a property right in its unissued degrees,"

---

[2] *See United States v. Turner,* 465 F.3d 667, 675 n.11 (6th Cir. 2006) (in *Frost*, "professors were found to have used the mails in furtherance of a plan to aid students in fraudulently obtaining degrees from the university *in exchange for* the student's causing federal agencies to award the professors government contracts.") (emphasis added).

which the defendants had a fiduciary duty to protect. *Id*. at 367. The Court then set the standard for proving a private honest services charge:

> Unlike a defendant accused of scheming to defraud another of money or property, . . . a defendant accused of scheming to deprive another of honest services does not have to intend to inflict an economic harm upon the victim. *Rather, the prosecution must prove only that the defendant intended to breach his fiduciary duty, and reasonably should have foreseen that the breach would create an identifiable economic risk to the victim.*

*Id*. at 369 (emphasis added); *see United States v. Douglas*, 398 F.3d 407, 419 (6th Cir. 2005) (holding *Frost* sets forth the standard of "proof" for private honest services, but an indictment only requires alleging a scheme to defraud and use of mail in furtherance).

Other circuits have applied the *Frost* "reasonably foreseeable harm" standard in affirming private-sector honest services convictions. *See United States v. Vinyard*, 266 F.3d 320, 327–28 (4th Cir. 2001) (adopting the reasonably foreseeable harm test in *Frost*); *United States v. Sun-Diamond Growers of Ca.*, 138 F.3d 961, 974 (D.C. Cir. 1998), *aff'd*, 526 U.S. 398 (1999) (citing *Frost* and holding that damage to the employer's reputation amounted to "economic harm . . . within the defendant's reasonable contemplation"); *United States v. deVegter*, 198 F.3d 1324, 1328–30 (11th Cir. 1999) ("a private sector violation of § 1346 honest services fraud involves a breach of a fiduciary duty and reasonably foreseeable economic harm."); *see also* Pattern Crim. Jury Instr. 11th Cir. OI O50.3 (2020) (citing *Frost* to support elements for private honest services fraud).[3] As the Fourth Circuit explained, citing *Frost*, "[t]he reasonably foreseeable harm test

---

[3] The Eleventh Circuit pattern instructions for private honest services mail fraud are as follows:

(1) the Defendant knowingly devised or participated in a scheme to fraudulently deprive the Defendant's employer of the right to honest services of the Defendant through bribery or kickbacks;
(2) the Defendant did so with an intent to defraud the Defendant's employer of the right to the Defendant's honest services;
(3) the Defendant foresaw or reasonably should have foreseen that the Defendant's employer might suffer economic harm as a result of the scheme; and

neither requires an actual economic loss nor an intent to economically harm the employer. . . . [T]he concept of 'economic risk' embraces the idea of risk to future opportunities for savings or profit; the focus on the employer's well-being encompasses both the long-term and the short-term health of the business." *Vinyard*, 266 F.3d at 329 (citing *Frost*, 125 F.3d at 369); *see also United States v. Coffey*, 361 F. Supp. 2d 102, 117–18 (E.D.N.Y. 2005) (citing *Frost* and other cases in explaining, "[t]hese cases reveal that the 'honest services' fraud is sufficiently pleaded where it alleges a perhaps unquantifiable harm inflicted on the defrauded entities which may, but does not necessarily result in, direct economic harm. Potential harm is the only prerequisite. . . .").

Further, criminal liability in an honest services bribe scheme for "a bribe *payor* is straightforward: the offer of the bribe is the violation of the statute." *United States v. Ring*, 706 F.3d 460, 467 (D.C. Cir. 2013); *United States v. Full Play Grp., S.A.*, 2021 WL 5038765, at *7 (E.D.N.Y. Oct. 29, 2021) ("Section 1346, moreover, equally reaches bribers and bribees, even if it is only the bribees who have the fiduciary relationship."). This means that, "though the offeror of a bribe is guilty of honest-services fraud, his attempted target may be entirely innocent." *Ring*, 706 F.3d at 467 (the "wire fraud statute punishes the scheme, not its success").

## 2. The Honest Services Predicates Are Not Vague.

The allegations in the Indictment set forth the elements of the private honest services predicate and put the Defendant on notice of the offensive conduct.[4] *Lee*, 919 F.3d at 349. The Indictment alleges:

---

(4) the Defendant used [the United States Postal Service by mailing or by causing to be mailed] [a private or commercial interstate carrier by depositing or causing to be deposited with the carrier or transmitting or causing to be transmitted] some matter, communication or item to carry out the scheme to defraud.

[4] In fact, as set forth above and in the government's response to Defendant Householder's motion to dismiss, this is *more* than is required to allege a RICO conspiracy. *See supra* footnote 1.

- The "Ballot Campaign," was "a ballot issue political action committee formed to repeal HB 6 through a ballot referendum," (Doc. 22, ¶ 26); and the campaign had until October 22, 2019 to collect signatures to put the ballot referendum on the ballot (¶ 28).

- CHS-1 "was employed by and was an agent of the Ballot Campaign as a supervisor, who, among other things, managed signature collectors"; and "[s]ignature collectors were employees and agents of the Ballot Campaign, whose duties included collecting signatures in favor of the referendum." (¶¶ 29–30).

- The Enterprise worked to defeat the Ballot Campaign (¶¶ 27, 50), and spent millions of dollars to further its efforts to defeat the campaign (¶ 122.)

- To defeat the campaign, "Householder's Enterprise bribed and attempted to bribe employees and agents of the Ballot Campaign to improperly discharge their campaign duties and *to obtain information* about the Ballot Campaign's organization in order to defeat the Ballot Campaign." (¶ 52.) (emphasis added)

- During this period, the Enterprise "used the Company-A-to-GENERATION-NOW money paid through Front Company to bribe and attempt to bribe signature collectors working for the Ballot Campaign," with the intent to defeat the Ballot Campaign's efforts, in part by paying signature collectors to stop collecting signatures. (¶¶ 123–24.)

- During this period, the Enterprise laundered $1.6 million through Borges' entity to defeat the Ballot Campaign, "including a bribe payment to a Ballot Campaign insider for information." (¶ 125.)

- On September 2, 2019, **BORGES** offered CHS-1, an employee and agent of the Ballot Campaign, bribe money for inside information about the Ballot Campaign to further **Householder's Enterprise's** efforts." (¶ 126.) Then, on September 13, 2019, using funds wired from GENERATION NOW, **BORGES** paid CHS-1 $15,000 for inside information about the Ballot Campaign. Following the exchange, **BORGES** asked CHS-1 through text messages on a number of occasions for the number of total signatures the Ballot Campaign had collected so Householder's Enterprise knew whether it needed to enhance its efforts to defeat the Ballot Campaign. (¶ 127.)

These allegations establish that the Enterprise pursued a quid pro quo scheme to bribe employees of the Ballot Campaign, who had a fiduciary duty to provide honest services to the Ballot Campaign,[5] for information the Enterprise would use to defeat the Ballot Campaign's

---

[5] Borges does not argue that CHS-1 or the signature collectors do not have a fiduciary duty to the Ballot Campaign. Nor could he. *Frost*, 125 F.3d at 366 ("It is axiomatic that an employee has a fiduciary duty to protect the property of his employer."). In any case, "[w]hether there actually exists a fiduciary duty is a fact-based determination that must ultimately be determined by a jury properly instructed on this issue." *United States v. Full Play Grp.*, 2021 WL 5038765, at *7 (E.D.N.Y. Oct. 29, 2021) (internal quotation marks omitted).

efforts. CHS-1 and signature collectors were hired to further the Ballot Campaign's efforts of collecting signatures to put the referendum on the ballot, but the Enterprise bribed the employees for information to help ensure the opposite—that the campaign would not collect the necessary signatures, contravening the purpose of the employees' relationship with the campaign. *See deVegter*, 198 F.3d at 1328–29 ("the breach of loyalty by a private sector defendant must in each case contravene—by inherently harming—the purpose of the parties' relationship"). And, in doing so, the Defendants foresaw that the breach arising from the bribe payments would create potential "economic risk" to the Ballot Campaign, *Frost*, 125 F.3d at 369—the Defendants pursued the bribery scheme intending that the Ballot Campaign would fail, *ending the campaign itself*, along with its ongoing effort to put the referendum on the ballot and repeal House Bill 6, *the very purpose of the campaign*. *See Vinyard*, 266 F.3d at 329 ("'economic risk . . . encompasses both the long-term and the short-term health of the business") (citing *Frost*, 125 F.3d at 369). Accepting these allegations as true, *McAuliffe*, 490 F.3d at 531, any vagueness challenge fails. *Skilling*, 561 U.S. at 413 ("[a] criminal defendant who participated in a bribery or kickback scheme, in short, cannot tenably complain about prosecution under § 1346 on vagueness grounds.").

### 3. Defendant Borges' Arguments for Striking the Private Honest Services Fraud Allegations Are Meritless.

Borges argues the private honest services predicates should be stricken as unconstitutionally vague. But a vagueness challenge is premature. A statute is unconstitutionally vague only if, "as applied" to a particular case, it either "(1) defines [the] offense in such a way that ordinary people cannot understand what is prohibited, or (2) encourages arbitrary or discriminatory enforcement." *United States v. Kettles*, 970 F.3d 637, 650 (6th Cir. 2020). "Few statutes meet the void-for-vagueness threshold: a 'strong presumptive validity' applies to all acts of Congress and mere 'difficulty' in determining a statute's meaning does not render it

unconstitutional." *Id*. (quoting *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963)). Thus, a defendant can only prevail in an "as applied" vagueness challenge if the statute "is so vague that it failed to provide him with 'sufficient warning' that [his actions] would violate the law." *Id*. (quoting *Nat'l Dairy Prods. Corp.*, 372 U.S. at 33). The "defendant bears the burden of establishing that the statute is vague as applied to his particular case, not merely that the statute could be construed as vague in some hypothetical situation." *United States v. Krumrei,* 258 F.3d 535, 537 (6th Cir. 2001). "It is fair 'to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.'" *United States v. Theunick*, 651 F.3d 578, 585 (6th Cir. 2011) (quoting *Boyce Motor Lines v. United States,* 342 U.S. 337, 340 (1952)).

Courts have routinely denied pretrial as-applied vagueness challenges as premature because courts need factual evidence presented at trial to assess such challenges. *See United States v. Reed*, 114 F.3d 1067, 1070 (10th Cir. 1997) ("hold[ing] that it was error to consider the [as-applied vagueness] challenge at the preliminary stage of the proceedings. . . . We conclude that such a sensitive and fact intensive analysis as that undertaken by the district court should be based only on the facts as they emerge at trial."); *United States v. Campbell*, 2020 WL 699821, at *3 (E.D. Tenn. Feb. 11, 2020) ("[A]t this stage in the proceedings, there are no facts for the Court to evaluate beyond what is alleged in the Second Superseding Indictment. As a result, the Court is unable to determine whether the statute is vague as applied to the facts of Defendant's particular case and thus will deny Defendant's motion to dismiss on vagueness grounds."); *United States v. Kettles*, 2017 WL 2080181, at *3 (M.D. Tenn. May 15, 2017), *aff'd*, 970 F.3d 637 (6th Cir. 2020) ("In considering Kettles' motion to dismiss the indictment [as void for vagueness], however, the court cannot make any determinations regarding the facts underlying the offense or the credibility

of the victim or Kettles' co-defendant; those determinations must be left for the jury."); *United States v. Ford*, 2016 WL 4443171, at \*14 (D. Or. Aug. 22, 2016) ("[Defendant] must wait to bring an as-applied vagueness challenge until the facts have been established by evidence introduced [at] trial and the fact-finder has had an opportunity to weigh in."); *United States v. Reyes*, 2007 WL 831808, at \*8 n.1 (N.D. Cal. Mar. 16, 2007) (same). Thus, the motion should be denied.

In any event, even assessing his claims, Borges's arguments have no merit. *First*, Borges argues the Indictment is vague because the allegations fail to meet the "official action" requirement under *McDonnell*. (Doc. 104 at PageID 1741–43). But *McDonnell's* official action analysis applies to *public official* corruption charges, as illustrated by the cases cited in Defendant's brief. (*See id*. at 1741–42 (citing *United States v. Nagin*, 810 F.3d 348 (5th Cir. 2016), *United States v. Lee*, 919 F.3d 340 (6th Cir. 2019), *Dimora v. United States*, 973 F.3d 496 (6th Cir. 2020))). Indeed, the Court in *McDonnell* based its "official act" reasoning on language in the federal public official bribery statute and on constitutional concerns unique to public officials. *See McDonnell v. United States*, 136 S. Ct. 2355, 2367–72 (2016) (analyzing 18 U.S.C. § 201 and constitutional concerns relating to public official interactions with constituents). In short, the touchstone of private-sector honest services fraud is not whether the bribery scheme involved the employee of the victim company performing an "official" act—because the employee is not a public "official."

Rather, the Sixth's Circuit decision in *Frost* established the elements of proof for private honest services in this Circuit: a bribery scheme inducing a breach of fiduciary duty while reasonably foreseeing that the employee's breach would create potential economic risk to the victim company. *Frost*, 125 F.3d at 369; *see also United States v. Khoury*, 2021 WL 2784835, at \*5 (D. Mass. July 2, 2021) (denying dismissal of private honest service charge post-*McDonnell* where quid pro quo bribe scheme alleged reasonably foreseeable harm); *Elgawhary v. United*

*States*, 2018 WL 398284, at *5–6 (D. Md. Jan. 11, 2018) (rejecting argument that *McDonnell* test applied and citing reasonably foreseeable harm among the "requisite elements of private sector honest services fraud"); *United States v. Lusk*, 2017 WL 508589, at *11 n.5 (S.D.W. Va. Feb. 7, 2017) (explaining *McDonnell's* "public-sector honest services" has "its own distinct requirements" while the reasonably foreseeable test applies in "private-sector honest services" cases)[6]; Pattern Crim. Jury Instr. 11th Cir. OI O50.3 (2020) (setting forth elements of private honest services fraud without reference to *McDonnell* official action while citing *Frost* as supporting instructions (*see supra* footnote 3)).

*Second*, the Defendant argues that buying out signature collectors and paying for inside information constitutes a vague application of private honest services fraud. (Doc. 104 at PageID 1744–49.) Again, such an argument is premature. But, even if were not, his argument fails based on a plain reading of the indictment. Contrary to Defendant's claim, the Indictment does not charge the Defendants with simply paying employees to "quit[] a job." (*Id*. at PageID 1744.) Rather, the honest services predicates allege the Enterprise offered bribe payments to employees and agents of the Ballot Campaign to stop doing the job they were being paid by the Ballot Campaign to do (collect signatures) and, instead, *provide information* about the Ballot Campaign's

---

[6] Specifically, in *Lusk*, the court explained the inapplicability of *McDonnell* official action in the private honest services context:

> the Fourth Circuit and the Fifth Circuit did not address the reasonably foreseeable harm or materiality tests in either *McDonnell* or *Nagin*. However, that is of no import, as those cases addressed honest-services theories in the *public*-sector context, *see McDonnell*, 792 F.3d at 504–20; *Nagin*, 810 F.3d at 350–52, which has its own separate and distinct requirements, *see, e.g.*, *McDonnell v. United States*, 136 S. Ct. 2355, 2367–75 (2016) (discussing the "official act" requirement of a public-sector honest-services offense). Conversely, a *private*-sector honest-service offense—one type of which is the subject of the instant case—requires, in part and in this Circuit, that the Government establish the elements under the reasonably foreseeable harm test. *See Vinyard*, 266 F.3d at 328–29.

*Lusk*, 2017 WL 508589, at *11 n.5 (emphasis in original). The Fourth Circuit in *Vinyard* applied *Frost* in adopting the reasonably foreseeable harm test. *See Vinyard*, 266 F.3d at 328 ("the reasonably foreseeable harm test, as adopted and explained by the Sixth Circuit in its *Frost* decision, is the better approach.").

efforts that the Enterprise could use to defeat the Ballot Campaign. (*See, e.g.,* Doc. 22, ¶¶ 52, 123–24.) Similarly, the Enterprise offered and paid a bribe to CHS-1, a supervisor of signature collectors, for inside information the Enterprise could use to defeat the Ballot Campaign. (*See id*. ¶¶ 125–27.)

Nor does the *quo* in the bribery scheme—the information the Enterprise was seeking from the Ballot Campaign's employees in exchange for bribe payments—need to be a "trade secret" or been deemed "confidential" in an employment contract to violate § 1346, as the defendant claims. (Doc. 104 at PageID 1746–48.) The defendant cites no case to support this conclusion. Rather, the information solicited through the bribe scheme must be sufficient to induce a breach of fiduciary duty and cause the Defendant to reasonably foresee an identifiable economic risk to the victim-company. *Frost*, 125 F.3d at 369.

As the Supreme Court explained in the context of "confidential business information," the "intangible nature does not make it any less 'property' protected by the mail and wire fraud statutes." *Carpenter v. United States*, 484 U.S. 19, 25 (1987). Indeed, courts have recognized that the *quo* received in exchange for a bribe may taking varying forms, to include business information. But what matters is the *potential economic harm* that would be caused by the breach of duty resulting from the bribery-induced *quo*. *See Frost*, 125 F.3d at 367 (university had property right in "unissued degrees" because "[a]warding degrees to [unqualified] students . . . will decrease the value of degrees in general"); *Khoury*, 2021 WL 2784835, at *5 (paying bribe to designate an individual as an athletic "recruit" sufficiently alleges quid pro quo given "value of an admissions slot"); *United States v. Sidoo*, 468 F. Supp. 3d 428, 441–42 (D. Mass. 2020) (concluding that offer of admission is property in part because admissions slots are "both limited and highly coveted"); *United States v. Avenatti*, 432 F. Supp. 3d 354, 363 (S.D.N.Y. 2020) (agreement to "not

12

publicly disclose the misconduct of Nike employees" in exchange for payments "sufficient to allege honest services wire fraud premised on a scheme to solicit a bribe"); *United States v. Person*, 373 F. Supp. 3d 452, 463–64 (S.D.N.Y. 2019) (denying vagueness challenge based on indictment, which charged a scheme whereby college coach accepted bribes in exchange for guiding players to retain services of bribe payors once players turned professional, because university had interest in running NCAA-compliant program and actions exposed college to significant fines and penalties).

Here, as set forth above, the Indictment alleges that the Enterprise paid bribes to employees of the Ballot Campaign, whose job it was to collect signatures to put the referendum on the ballot, in return for non-public information that would help the Enterprise defeat the campaign, causing it to lose its funding, terminate its employees, and cease operations. But the specifics and nature of the information—*e.g.*, why keeping the signature count confidential prior to publication was valuable to the campaign, how the Enterprise intended to use the signature information to defeat the campaign—are trial issues that the fact finder must assess in the first instance *based on all of the evidence*, not simply cold allegations in the Indictment. *See Douglas*, 398 F.3d at 419 (reversing dismissal of indictment and agreeing that whether a fiduciary duty was breached in private honest services charge is an "evidentiary burden" for trial not an element necessary for indictment); *Person*, 373 F. Supp. 3d at 464 ("It is a factual question whether this duty to help run an NCAA-compliant athletics program was breached, and thus that issue is not an appropriate basis for dismissal."). This illustrates why Borges' vagueness arguments are premature.

Nevertheless, even if the motion is not premature and the *Frost* "proof" standards applies to pleadings (which it does not, *see Douglas*, 398 F.3d at 419), the Indictment sets forth allegations satisfying the standard. The signatures putting House Bill 6 on the ballot were intangible property

that the Ballot Campaign collected; indeed, collecting signatures to overturn House Bill 6 was the Ballot Campaign's primary business purpose at that time. By knowing in real-time the number of signatures and the non-public status of the campaign's efforts before the Ballot Campaign published that information, the Enterprise could determine how best to use its millions of dollars in resources to ensure that the campaign was unable to collect the necessary signatures—by, for example, increasing its efforts and buying out additional campaign workers—during a high stakes and chaotic two-month period between the Ohio Attorney General's certification of the ballot language and the date by which the Ballot Campaign was required to submit its signatures. The jury can reasonably infer that this is why the Enterprise offered bribes to Ballot Campaign employees in exchange for that information. The non-public signatures were therefore the Ballot Campaign's property—which it had a right to use, possess, and dispose of as it pleased—that had value to the Ballot Campaign before it decided to publish the information, satisfying the *Frost* standard. *Frost*, 125 F.3d at 367 ("the concept of 'property' . . . includes the rights to possess, use, exclude, profit, and dispose"); *Carpenter*, 484 U.S. at 26–27 ("Petitioners cannot successfully contend . . . that a scheme to defraud requires a monetary loss, such as giving the information to a competitor; it is sufficient that the Journal has been deprived of its right to exclusive use of the information, for exclusivity is an important aspect of confidential business information and most private property for that matter.").

*Finally*, striking the challenged allegations from the Indictment is inappropriate, in any event. Again, allegations are not surplusage "if the language in the indictment is information which the government hopes to properly prove at trial . . . (provided, of course, it is legally relevant)." *Moss*, 9 F.3d at 550. In the context of a racketeering conspiracy, "the government is not limited solely to pleading the elements of the offense (with anything falling outside the

elements subject to being struck as surplusage)." *United States v. Rich*, No. 18-2268, 2021 WL 4144059, at *35 (6th Cir. Sept. 13, 2021). Rather, acts supporting a RICO conspiracy have been found "legally relevant because they tended to show either an agreement to form a RICO enterprise or the actual existence of the enterprise." *Id.*; *see also United States v. Rios*, 830 F.3d 403, 421 (6th Cir. 2016) (the government is "required to prove both the existence of a racketeering enterprise and each defendant's association with that enterprise.").

Here, the challenged allegations support the properly plead honest services predicates, as set forth above. But these allegations are also relevant to establishing both the existence of the racketeering Enterprise and Defendants' association with the Enterprise. *See Boyle v. United States*, 556 U.S. 938, 944 (2009) (RICO reaches "a group of persons associated together for a common purpose of engaging in a course of conduct."). For example, as alleged in the Indictment, between August 2, 2019 and October 21, 2019, the Enterprise laundered approximately $23 million of $35.7 million in Company A money received by Generation Now through Front Company to defeat the Ballot Campaign, including paying bribe payments to signature collectors (Doc. 22, ¶ 122–23); and the Enterprise laundered approximately $1.6 million in Company-A-to-Generation-Now payments through Borges' 17 Consulting bank account to defeat the Ballot Campaign, including a bribe payment to a Ballot Campaign insider, (*id*. ¶ 125). Given allegations in the Indictment showing Householder's control of Generation Now and payments he received from Company A to perform official action relating to passing and preserving House Bill 6, the challenged allegations show that Enterprise members were working together for a "common purpose" to further the Enterprise and that Borges was associated with the Enterprise, among other things. *Boyle*, 556 U.S. at 944. These allegations are thus legally relevant facts "the government hopes to properly prove at trial," so striking them is improper. *Moss*, 9 F.3d at 550.

15

For these reasons, the Defendant's motion to strike portions of the Indictment supporting the private honest services predicates should be denied.

**B. Travel Act Predicates Are Properly Plead and Should Not Be Stricken**

Borges also argues that the Court should strike allegations relating to the Travel Act, 18 U.S.C. § 1952, involving acts of bribery under Ohio Rev. Code § 3517.22(a)(2), based on due process and federalism concerns. (Doc. 104 at PageID 1749–52.) Specifically, he argues § 3517.22(a)(2) is broader than the generic definition of bribery and the predicates are thus overbroad; and the predicates violate federalism concerns because § 3517.22(a)(2) governs inherently intrastate activity. These arguments have no merit.

Relevant here, the Travel Act criminalizes using "any facility in interstate or foreign commerce, with intent to: . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity," to include, "bribery . . . in violation of the laws of the State in which committed." 18 U.S.C. § 1952 (a), (b)(i)(2). Ohio Rev. Code § 3517.22 states:

> (A) No person during the course of any campaign in advocacy of or in opposition to the adoption of any proposition or issue submitted to the voters shall knowingly and with intent to affect the outcome of such campaign do any of the following:
>
> . . .
>
> > (2) Promise, offer, or give any valuable thing or valuable benefit to any person who is employed by or is an agent of a committee in advocacy of or in opposition to the adoption of any ballot proposition or issue, for the purpose of influencing the employee or agent with respect to the improper discharge of the employee's or agent's campaign duties or to obtain information about the committee's campaign organization.

Ohio Rev. Code § 3517.22(a)(2).

The Supreme Court addressed federal Travel Act violations involving state law commercial bribery in *United States v. Perrin*. In *Perrin*, the Court held, "Congress intended 'bribery . . . in

16

violation of the laws of the State in which committed' as used in the Travel Act to encompass conduct in violation of state commercial bribery statutes." 444 U.S. 37, 50 (1979) (quoting § 1952). In doing so, the Court defined "generic bribery," which included "the bribery of individuals acting in a private capacity," as "payments to private persons to influence their actions." *Id*. at 43–45. Courts thus look to the generic definition of bribery as set forth in *Perrin* to determine whether a state court violation is a Travel Act predicate. *See United States v. Welch*, 327 F.3d 1081, 1090–91 (10th Cir. 2003) (explaining, given title and language of Utah misdemeanor commercial bribery statute, that the statute "may serve as a predicate for a Travel Act violation appears unremarkable" under *Perrin*); *United States v. Gross*, 370 F. Supp. 3d 1139, 1149–50 (C.D. Cal. 2019) (payments to induce a doctor to use position of trust to influence another for the purpose of financially benefitting a third party in violation of California Business and Professions Code and California Insurance Code "easily falls into the generic definition of bribery" under *Perrin*); *see also United States v. Bowling*, 2010 WL 5067698, at *2–8 (E.D. Ky. Dec. 7, 2010), *aff'd sub nom.*, *United States v. Adams*, 722 F.3d 788 (6th Cir. 2013) (applying *Perrin* and finding Kentucky vote-buying statute a RICO predicate). The analysis requires comparing the defendant's conduct to "the generic definition of . . . 'bribery' and to the elements of an appropriate state-law offense." *United States v. Rogers*, 389 F. Supp. 3d 774, 792–93 (C.D. Cal. 2019) (adopting a "conduct-based approach . . . [b]ecause [*United States v. Nardello*, 393 U.S. 286 (1969)] and *Perrin* clearly require comparisons of the defendant's conduct, rather than a comparison of the elements of a generic offense to the elements of a predicate offense"); *Bowling*, 2010 WL 5067698, at *6 ("the inquiry is whether the *activity* fits within the generic definition of the particular category and 'whether the particular state involved prohibits the . . . activity charged.'") (quoting *Nardello,* 393 U.S. at 294) (emphasis added).

17

Here, the Indictment alleges "it was part of the conspiracy that **Householder's Enterprise** bribed and attempted to bribe employees and agents of the Ballot Campaign to improperly discharge their campaign duties and to obtain information about the Ballot Campaign's organization in order to defeat the Ballot Campaign." (Doc. 22, ¶ 52.) The Indictment further details the conduct in several paragraphs, as set forth above, alleging the Defendant's scheme to bribe employees and agents for information that would help the Enterprise defeat the Ballot Campaigns' efforts. *See supra* Part III(A)(2). The conduct tracks the language of Ohio Rev. Code § 3517.22(a)(2) and satisfies the elements of generic bribery—the Enterprise made "payments to private persons to influence their actions," *Perrin*, 444 U.S. at 43, namely, to influence them to stop collecting signatures they were paid to collect and, instead, provide information that the Enterprise would use to defeat the campaign, in violation of the employees' duty to the campaign. This conduct is a violation of § 3517.22(a)(2) and generic bribery under *Perrin*.

Borges' arguments to the contrary fail. *First*, he argues that § 3517.22(a)(2) is broader than the generic definition of bribery in *Perrin*. This is incorrect. As set forth above, the conduct charged—bribe money to influence action by employees of the Ballot Campaign—is both generic bribery under *Perrin* and satisfies the elements of § 3517.22(a)(2). This ends the inquiry based on the conduct charged.[7] *Rogers*, 389 F. Supp. 3d at 793. In any case, even comparing the elements, § 3517.22(a)(2) fits: generic bribery includes *offering payment* (to private persons) "*to influence their actions*," *Perrin*, 444 U.S. at 43 (emphasis added); while § 3517.22(a)(2) criminalizes *offering payment* (to private employees of a ballot campaign) "*for the purpose of influencing*" their actions, either "with respect to the improper discharge of the employee's or agent's campaign

---

[7] The Defendant cites Ohio Rev. Code § 2921.02 in support. But the fact that a different Ohio bribery statute, involving public official bribery, has a different quo is irrelevant to whether the Defendant's conduct satisfies generic bribery under *Perrin* and meets the elements of § 3517.22(a)(2).

duties" or "to obtain information about the committee's campaign organization," Ohio Rev. Code § 3517.22(a)(2) (emphasis added).

*Second*, Borges argues that predicating the Travel Act on § 3517.22(a)(2) "violates federalism concerns" because the statute "governs an inherently intrastate activity." (Doc. 104 at PageID 1751.) But *this is the purpose of the Travel Act*. The Supreme Court explained in *Perrin* that Congress enacted the Travel Act "to aid state and local governments which were no longer able to cope with increasingly complex and interstate nature of large-scale multiparty crime." *Id.* at 41. Specifically, "Congress employed its now familiar power under the Commerce Clause of the Federal Constitution to prohibit activities of traditional state and local concern that also have an interstate nexus." *Id.* at 42. "[I]t is clear beyond doubt that Congress intended to add a second layer of enforcement supplementing what it found to be inadequate state authority and state enforcement." *Id.* In fact, the Court expressly rejected a federalism challenge to Travel Act violations involving a state commercial bribery statute. *Id.* at 49–50; *see Welch*, 327 F.3d at 1093 ("Because the Travel Act was within Congress' constitutional prerogative to enact, commercial bribery coupled with a sufficient interstate nexus is a matter of federal concern."). So Borges' challenge to the intrastate nature of the conduct has no merit.

Nor is the fact that § 3517.22(a)(2) is a "minor" state offense relevant to the analysis. (Doc. 104 at PageID 1752); *see Perrin*, 444 U.S. at 39 n.3, 50 (affirming Louisiana misdemeanor commercial bribery under La. Rev. Stat. § 14.73 as Travel Act predicate)[8]; *Welch*, 327 F.3d at 1090–93 (reversing dismissal of Travel Act counts that relied on misdemeanor commercial bribery statute as predicate); *Gross*, 370 F. Supp. 3d at 1149 (denying dismissal of Travel Act state law misdemeanor Travel Act predicates, California Business and Professions Code § 650 and

---

[8] *See United States v. Perrin*, 580 F.2d 730, 739 (5th Cir. 1978) (noting Louisiana statute at issue in *Perrin*, La. Rev. Stat. § 14.73, was misdemeanor carrying maximum six months imprisonment) (J. Rubin, dissenting)).

California Insurance Code § 750).  Rather, the RICO statute notes specifically when a felony is required for a predicate offense, which it does not do for the Travel Act.  *See, e.g.,* 18 U.S.C. § 1961(1)(B) (defining as "racketeering activity" a violation of "section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious" while listing the Travel Act as a violation of "section 1952 (relating to racketeering)" without reference to nature of offense).  The severity of § 3517.22(a)(2) under Ohio law is therefore irrelevant.

For these reasons, the Defendant's motion to strike allegations relating to the Travel Act predicates should be denied.

## IV.  CONCLUSION

The Defendant's motion to strike should be denied.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney


*s/ Emily N. Glatfelter*
EMILY N. GLATFELTER (0075576)
MATTHEW C. SINGER (IL 6297632)
Assistant United States Attorneys
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Office: (513) 684-3711
Fax: (513) 684-6385
Email:  Matthew.Singer@usdoj.gov
E-mail: Emily.Glatfelter@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the foregoing was filed with the Court's CM/ECF System this 22nd day

of February 2022, which provides electronic notice to all parties.

<u>*s/ Emily N. Glatfelter*</u>
EMILY N. GLATFELTER (0075576)
Assistant United States Attorney