**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **United States of America,** | : | |
| | : | **Case No.: 1:20-cr-077** |
| **Plaintiff,** | : | |
| v. | : | **Judge Timothy S. Black** |
| | : | |
| **Matthew Borges,** | : | |
| | : | |
| **Defendant.** | : | |

---

**DEFENDANT BORGES' REPLY TO GOVERNMENT'S RESPONSE**
**TO BORGES' MOTION TO STRIKE**

---

Defendant, Matthew Borges ("Borges"), through counsel, hereby provides his Reply to the Government's Response in Opposition to Borges' Motion to Strike Prejudicial Surplusage (R.113). The Court should grant Borges' Motion (R.104) and grant the relief requested therein.

## I.  <u>Introduction</u>

The Government's response is an attempt to obfuscate the issues raised by Borges in his Motion, and only serves to compound the problems the Government has with its case against Borges overall.

In *Skilling*, the Supreme Court limited application of § 1346 to schemes involving a breach of a fiduciary duty through bribery or kickbacks, and mandated application of the federal definitions those terms in all cases (public and private).  The Government's allegations do not fit within the established limitations of § 1346, so it simply ignores those limitations, points to other irrelevant issues, and makes up its own legal conclusions in an

1

attempt to shoehorn a particular set of facts it does not like into a purported violation of § 1346.

The Government's Response begins with a red herring by directing the Court's attention to a different element—the reasonably foreseeable harm element—of private-sector honest services fraud that the Government then falsely claims is the "standard." In doing so, the Government attempts to hoodwink the Court into ignoring the issue raised—whether the Government's application of § 1346 here is unconstitutionally vague. Spending a mere one paragraph on the issue of "official action," an element of bribery under federal law, the Government then posits that the *quo*, in *quid pro quo*, can be any "business information," even if that information is not protected from disclosure under any recognized legal standard, so long as there is some foreseeable economic harm that could be caused by its disclosure. The Government's rationale flies in the face of settled law and is nothing more than an attempted resurrection of the unconstitutionally ambiguous conflict-of-interest cases rejected by the Court in *Skilling*. Indeed, the Government's Response illustrates the as-applied vagueness problems Borges raised—lack of fair notice and arbitrary prosecution.

Turning to the Travel Act, the Government misreads the alleged state predicate, Ohio Rev. Code § 3517.22(A)(2), to avoid the overbreadth issue raised in Borges' Motion. And, the Government ignores the fact that the Ohio Legislature determined § 3517.22 is not subject to the general police and prosecutorial power of state (let alone the federal government). The Government "should respect that decision and avoid giving 'help' to state law enforcement where that help is neither asked for nor wanted." *United States v. Ferber,* 966 F. Supp. 90, 107 (D. Mass. 1997).

## II.  **Discussion**

### A.  **Unconstitutional Application of Private-Sector Honest Services Fraud**

#### 1.  **Ignoring the Elements -- The Government's Red Herring**

The Government has no legitimate answer to Borges's argument that bribery, for purposes of § 1346, is defined by § 201(b) and requires an official act. That fact, settled by the United States Supreme Court in *Skilling*, has not been limited by the Court nor the Sixth Circuit in the manner the Government asserts. Lacking any cogent argument to the contrary, the Government attempts to shift away from the requisite bribery element and instead presents the red herring of "reasonably foreseeable economic harm," an element that has no currency here. In its response, the Government argues that the "Sixth Circuit set forth the standard for a private honest services bribery scheme in *United States v. Frost*." (R.113 at PageID 2589.) Then the Government spends nearly three pages of its Response laying out the contours of that element as it sees them. (R.113 at PageID 2589-91.) But that is only one element of § 1346, and while it is dubious on its own, as is detailed below, it cannot stand alone in place of another necessary element—bribery. Further, it is **not** the element at the heart of Borges' motion.

Aside from the fact that *Frost* was decided prior to *Skilling*, *Frost* provides no guidance on whether bribery, for purposes of § 1346, requires a *quid pro quo*, meaning a specific intent to or receive something of value in exchange for an official act, the issue at the center of Borges' Motion. (R.104 at PageID 1741-43.) The Government's tactic of deflecting to a different issue is unsurprising.

Instead, the Government devotes a mere single paragraph to whether bribery requires "official action," bizarrely concluding that "official action" is only required for public honest services cases. (R.113 at PageID 2595.) But that is a novel limitation, never recognized by the Supreme Court, and is directly refuted by case law inside and outside of the Sixth Circuit,

including cases the Government cites in its own Response while attempting to make a different, and irrelevant, point. The inclusion of this argument is striking in its mendacity. It is also utterly wrong.

The Supreme Court in *Skilling* did not limit the federal definition of bribery to public honest services cases. Had the Court intended that limitation, it would have said so. But it did not. In fact, quite the opposite. *See Skilling v. United States,* 561 U.S. 358, 413 n.45 (2010) (clarifying that the federal bribery statutes, through § 1346, would apply not only to federal public officials but also to "state and local corruption and to private-sector fraud[.]"). Moreover, it would not have made any sense for the Court in that case to limit those federal definitions of bribery to only public officials, *since* Skilling *was a private actor, not a public one*.

Following the Court's mandate in *Skilling*, the Sixth Circuit has looked to the general federal bribery statute, 18 U.S.C § 201(b), to define bribery for purposes of the honest services fraud statute. *See United States v. Lee*, 919 F.3d 340, 350 (6th Cir. 2019) (holding that honest services fraud "requires either an 'official act' in furtherance of the corrupt relationship or an agreement to perform an official act."); *Dimora v. United States*, 973 F.3d 496, 498, 500 n.3 (6th Cir. 2020) (reversing district court's denial of § 2255 petition as to certain honest services convictions in light of *McDonnell* and noting that "courts commonly construe [Hobbs Act extortion and honest services fraud] as requiring an 'official act' as defined in the federal bribery statute, 18 U.S.C. § 201[.]"). The Sixth Circuit did not, in either case, limit its holdings to public officials.

The Government weakly argues that somehow *McDonnell* limits the federal definition of bribery, found in § 201(b), to only public officials for purposes of § 1346. (R.113 at PageID 2595.) It did not. While the Court in *McDonnell* clarified the contours of what constitutes

4

"official action" for purposes of § 201(b) in relation to public officials, the fact remains that *Skilling* still requires use of the federal definition of bribery in all honest services cases. As demonstrated below, the Government knows this too.

Moreover, the Government's argument is inconsistent with the position it took recently in another private-sector honest services case in the Southern District of Ohio. *See United States v. Yu Zhou*, 2:19-cr-163-SDM, Gov. Response in Opp., R.59 at PageID 603 (OHSD) (arguing, in a private-sector case, that "honest services fraud requires a breach of [a] fiduciary duty by participation in a bribery or kickback scheme—that is, a scheme involving the actual, intended, or solicited exchange of a thing of value for *official action*.") (emphasis added). No defendant in that case was a public official, as the Government well knows. Now, the Government, ignoring Supreme Court and Sixth Circuit precedent, and diverging from its previous position, fails to even attempt to offer any legally recognized definition of bribery. Instead, the Government is attempting to recast the standard for honest services fraud to be whatever the Government says it is in any particular case—the very definition of an arbitrary application.

Rather than discuss the necessary elements of bribery, the Government turns its attention to a different element of honest services fraud—reasonably foreseeable economic harm. (R.113 at PageID 2595-96). The Government then string cites several district court cases for the proposition that, post-*Skilling*, reasonably foreseeable economic harm is an element in private-sector honest services cases. *Id.* But that is not the issue here.

For instance, the district court in *Khoury* expressed nothing about the definition of bribery for purposes of § 1346. *See United States v. Khoury,* 2021 WL 2784835, *in passim* (D. Mass. July 2, 2021). And the district court in *Elgawhary* merely stated that the definition of bribery found in § 201(b) is not the only federal definition of bribery and that other federal

definitions of bribery could apply for purposes of § 1346, a finding consistent with *Skilling*. *See Elgawhary v. United States*, 2918 WL 398284, at *4-6 (D. Md. Jan. 11, 2018). While the district court in *Elgawhary* was generally correct, the Sixth Circuit has twice looked to the definition of bribery in § 201(b) and held that official act is a requirement for purposes of § 1346. Finally, the district court in *Lusk* acknowledged that bribery or kickback is a distinct element in honest services fraud cases, an unremarkable proposition but one the Government here simply chooses to ignore. *United States v. Lusk*, 2017 WL 508589, at *7-8 (S.D.W.Va. Feb. 7, 2017).

The Government offers no credible opposition to the proposition that bribery, for purposes of § 1346, requires a *quid pro quo*—meaning a specific intent to give or receive something of value in exchange for an official act under Supreme Court and Sixth Circuit precedent. While far from the only misinformation the Government has filed in this case, the assertion that an official act is not a requirement for a § 1346 violation is wrong, and the attempted pivot to an argument about foreseeable economic harm is just a red herring and nothing more.

### 2. Borges' Motion is Not Premature

The Government claims that Borges' vagueness challenges are "premature because courts need factual evidence presented at trial to assess such challenges." (R.113 at PageID 2594.) No. Courts within the Sixth Circuit and elsewhere routinely decide such pretrial motions where such factual evidence is unnecessary. *See e.g. United States v. Yu Zhou,* 2020 WL 708391, *4 (S.D. Ohio Feb. 12, 2020); *United States v. Wainwright*, 89 F. Supp.3d 950, 955 (S.D. OH Feb. 20, 2015); *United States v. Hedrick,* 207 F. Supp. 2d 710, 713-14 (S.D. Ohio June 21, 2002). Asking the Court to ignore the law so the Government can proceed to trial is,

in essence, what the Government is seeking here. That is precisely what these vagueness challenges are intended to preclude.

As discussed below, the factual allegations relevant to the private-sector honest services fraud predicates are well-defined. Those factual allegations make clear that the Government's application of § 1346 here is unconstitutionally vague. Borges' Motion is, therefore, "capable of determination without trial of the general issue." *United States v. Jones,* 542 F.2d 661, 664 (6th Cir. 1976.)

### 3. The Government's Theories

In his motion, Borges explained why the Government's theories of private-sector honest services fraud are unconstitutionally vague as applied. (R.104 at PageID 1744-48.) Borges explained why "buying out" signature gatherers (*i.e.*, paying them to quit) was not an official act and could not be considered a breach of a fiduciary duty for purposes of § 1346.[1] (R.104 at PageID 1744-45.) He explained why the Government's attempt to expand § 1346 using an amorphous term "inside information" fails constitutional muster, and he explained why disclosing such "inside information" about one's employer was not an official act and could not be considered a breach of a fiduciary duty for purposes of § 1346. (R.104 at PageID 1745-48.)  In response, the Government reframes the issues to avoid the obvious—namely, private-sector honest services fraud, as applied here, is void for vagueness.  None of the Government's responses withstand scrutiny and the Court should grant Borges' Motion.

    a.  <u>Paying Signature Gatherers to Quit the Ballot Campaign Was Not a Federal Crime</u>

The Government claims that "the Indictment does not charge the Defendants with *simply* paying employees to 'quit[] a job.'" (R.113 at PageID 2596) (emphasis added). Instead,

---

[1] The Indictment does not allege that Borges personally participated in any buying out of signature gatherers.

the Government, rather carefully, contends that "the honest services predicates allege the Enterprise offered bribe payments to employees and agents of the Ballot Campaign to stop doing the job they were being paid by the Ballot Campaign to do (collect signatures) and, instead, provide information about the Ballot Campaign's efforts[.]" (R.113 at PageID 2596-97.) By claiming the alleged payment was to both "stop doing the job" and "provide information" the Government is, at best, playing with semantics. At worst, it is misleading the Court. Rather than just acknowledge that "to stop doing the job" means quitting the Ballot Campaign, the Government *implies* that signature gatherers kept working for the Ballot Campaign with an instruction to stop gathering signatures "and, instead, [were to] provide information." But that is a false inference and is not what is alleged to have happened. Because the Government's inference could, even unwittingly, muddle the facts of what the Government alleges to have taken place, further elucidation is necessary to prevent the Court from being misled.

*First*, that is not what the Indictment alleges. (R.22 at PageID 1282.) *Second*, the detailed Complaint, which made clear that signature gatherers were paid to quit, does not allege that either. (R.5, Complaint, ¶229) (the offer was $2500 and plane fare with "half upon signing a contract with Front Company and half upon proof the plane fare was used to fly home, away from Ohio"). *Third*, news reports from October 2019 make it clear that the signature gatherers were paid to quit. *See e.g.,* Jeremy Pelzer, "Intimidation, delays cripple HB6 referendum petition drive, leader says," (October 22, 2019) available at https://www.cleveland.com/open/2019/10/intimidation-delays-crippled-hb6-referendum-petition-drive-leader-says.html?outputType=amp (pro-HB6 groups were "getting petitioners' contact information from their state registration forms and luring them away with promises of more money. Rogers said that he himself got a text from a petition firm working for his opponents offering a $500 bonus for him to quit."); Randy Ludlow, "Judge to rule soon

8

whether to grant HB 6 referendum effort more time" (October 22, 2019) available at https://amp.dispatch.com/amp/2458833007 ("Offers to the circulators then escalated to payments of $2,500 and a plane ticket to simply stop working and return home, Rogers testified. 'People left. People took the money,' he said.") *Finally*, as referenced in the above news articles and the Complaint (R.5, ¶234), on October 22, 2019, there was a preliminary injunction hearing before Judge Sargus in *Ohioans Against Corporate Bailouts, LLC v. LaRose, et al.*, 2:19-cv-4466, R.48 (Hearing Transcript) (OHSD), where this issue was raised and testimony adduced.

During the hearing, William "Billy" Rogers testified that he was the owner and founder of Advanced Micro Targeting ("AMT"), and that AMT was hired by the Ballot Campaign to lead the effort to gather signatures for the HB6 referendum. (Hr. Tr. at PageID 751, 753.) Rogers testified that AMT does not hire independent contractors, instead hiring on staff as employees (hourly for part-time and salary for full-time). (Hr. Tr. at PageID 756-7.) Rogers testified that AMT's employees were offered money to quit and go over to the other side, resulting in an "extraordinary" amount of "turnover" and people quitting. (Hr. Tr. at PageID 800-01.) Importantly, Rogers was asked, by an Assistant Ohio Attorney General on cross-examination, "The question was did these circulators simply find an easier higher paying job than the one with AMT or any of its vendors?" to which Rogers answered "Yes. Yes." (Hr. Tr. at PageID 825.)

The Government's erroneous inference is nothing more than a subtle ploy to convince the Court to avoid ruling on this clear legal issue now and, instead, allow it to present evidence later that it hopes will paint Borges in an unflattering light, but that it must know does not amount to a crime. (*See e.g.*, R.113 at PageID 2596) (claiming that "such an argument is premature."). In fact, the Government does not even attempt to claim that a determination of what might constitute an official act is appropriate for trial. In a tacit acknowledgement

that no such qualifying act took place, it simply argues that it does not need to establish that element. Regardless, offering something of value to someone else's employee to quit their job—the first of the Government's theories here—is not an illegal *quid pro quo* because quitting is not an official act. Moreover, quitting a job is a not a breach of a fiduciary duty.

### b. Disclosing Non-Confidential Information about the Ballot Campaign is Not a Federal Crime

The Government has stated that its theory is that: (1) CHS-1 and the signature gatherers were employees of the Ballot Campaign; (2) the signature count[2] was intangible property of the Ballot Campaign; (3) CHS-1 and the signature gatherers, as employees, had a duty to the Ballot Campaign to not disclose the signature count; (4) Borges and/or the Enterprise offered *quid* (*e.g.*, money) in exchange for disclosure of the signature count (the alleged *quo*); and (5) disclosure of the signature count could result in potential economic harm to the Ballot Campaign. (R.113 at PageID 2597-99.)

The Government starts from a false premise—that CHS-1 and the signature gatherers were "employees of the Ballot Campaign[.]" (R.113 at PageID 2598.) But they were not, as the Government has acknowledged. (R.96 at PageID 1660) ("CHS 1's employer was hired to be part of that campaign, and CHS-1 was hired by his employer to further the Ballot Campaign's efforts.") At most, CHS-1 and the signature gatherers were agents of the Ballot Campaign. So, if CHS-1 and the signature gatherers owed fiduciary duties as employees then that duty was owed to someone other than the Ballot Campaign, *i.e.,* the vendors. It is not at all clear whether CHS-1 and the signature gatherers owed a *fiduciary* duty to the Ballot Campaign, what the source of that fiduciary duty was, nor even what the scope of those duties were. *See Skilling,* 561 U.S. at 417-420 (Scalia, J. dissenting) (discussing the

---

[2] The Government has implicitly conceded that the term "inside information" as used in the Indictment means the number of signatures gathered. (R.113 at PageID 2598-99.)

indefiniteness of the source and scope of fiduciary duties). But the Government's theory of honest services fraud fails without having to reach these other ambiguities.[3]

The Government argues that the signature count is intangible property of the Ballot Campaign, which "it had a right to use, possess, and dispose of as it pleased—that had value to the Ballot Campaign before it decided to publish the information," (R.113 at PageID 2598) and that "what matters is the *potential economic harm* that would be caused by the breach of duty resulting from the bribery-induced *quo*." (R.113 at PageID 2597.) Specifically, the Government explains: "the Indictment alleges that the Enterprise paid bribes to employees of the Ballot Campaign, whose job it was to collect signatures to put the referendum on the ballot, in return for *non-public information* that would help the Enterprise defeat the campaign, causing it to lose its funding, terminate its employees, and cease operations." (R.113 at PageID 2598) (emphasis added).

The Government never actually claims, nor does the Indictment allege, that the signature count was *confidential business information*, because it knows it was not. Instead, the Government replaces one amorphous term, "inside information," with another—now referring to the signature count as "non-public information" and "non-public signatures." (R.113 at PageID 2598-99.) But non-public does not equal confidential because something can be non-public without an intent that it be kept confidential. And signatures on a referendum petition are, by their very nature, public.[4]

---

[3] While this issue is not material to the issues raised in Borges' motion, it illustrates other ways in which § 1346 is unconstitutional as applied.

[4] Signors "must be a qualified elector of the state[]" and they must include their signature, printed name, the date and their "voting residence," meaning their address, on the petition. Ohio Rev. Code § 3519.10. On the petition itself are places for multiple signatures, so each signor can see the information of other signors. *See* Ohio Rev. Code § 3519.05.  And, ultimately, signed petitions are publicly filed with the Ohio Secretary of State or a board of elections.  Ohio Rev. Code § 3519.051. There is nothing proprietary nor confidential about petitions or the signatures that appear on them.

By hiding behind ambiguous language ("inside information" and "non-public information"), the Government proves the very point of Borges' Motion—that the Government is expanding § 1346 liability beyond previously recognized limits (relating to confidential business information and trade secrets). *See United States v. Procter & Gamble Co.,* 47 F. Supp. 676, 678 (D. Mass 1942) (holding that it is an implied part of the employment relationship that the employee "will not wrongfully divulge to others the confidential information, trade secrets, etc., belonging to his employer.") Without a previously established legal basis of confidentiality, the Government's theory of § 1346 liability is unconstitutionally vague.

According to the Government, the signature count need not have "been deemed 'confidential' in an employment contract to violate § 1346[.]" (R.113 at PageID 2597.) The Government has even called the confidentiality terms of CHS-1's employment agreement "irrelevant." (R.104 at PageID 1747 n.6.) The Government's position offends common sense and runs counter to the crux of the Supreme Court's decision in *Carpenter*, that "[t]he official policy and practice at the Journal was that, prior to publication, the contents of the column were the Journal's confidential information." *Carpenter*, 484 U.S. at 23. Because of that workplace's rule regarding confidentiality, the Journal's employees had a "duty of safeguarding" the column's contents prior to publication. *Id.* at 28. Here, the Government attempts to replace the Ballot Campaign's and their vendor's decisions about confidentiality—reflected in the applicable employment agreements—with the Government's after-the-fact judgments.

The Supreme Court's rationale in *Carpenter* makes sense: fair notice was provided to the employees about what information was confidential and their obligations with respect to that confidential information. *See also United States v. Czubinski*, 106 F.3d 1069, 1071 (1st Cir. 1997) (noting that "IRS rules plainly stated that employees with passwords and access

codes were not permitted to access files on IDRS outside of the course of their official duties."); *United States v. Girard,* 601 F.2d 69, 71 (2nd Cir. 1979) (DEA employee "must have known that the sale of DEA confidential law enforcement records was prohibited. The DEA's own rules and regulations forbidding such disclosure may be considered as both a delimitation and a clarification of the conduct proscribed by the statute."). The Government's position in this case, on the other hand, makes no sense. Under the Government's rationale, even if information is not confidential under the employee's written employment agreement, the employee (or agent) is under some ethereal duty prohibiting disclosure of the non-confidential information, thereby allowing the Government to prosecute an alleged breach of that duty as criminal act.[5]

Making things even more unfathomable, the Government rejects a statutory category of confidential information—trade secrets—as an alternative source of confidentiality in the private-sector. (R.113 at PageID 2597.) So, if not the terms of an employment agreement or federal trade secret laws, then what is the legal basis for confidentiality of the signature count? The Government provides no answer and rejects the legal sources that give fair notice of what information is confidential, opting again for their *whatever-it-says-it-is* application. (*Compare* R.113 at PageID 2597-98 *with* R.104 at PageID 1746-48.) This indefiniteness is constitutionally fatal to the Government's theory.

Rather than offer a legal basis for the signature count being confidential and a legal fiduciary duty to protect it, the Government argues that "why keeping the signature count confidential prior to publication was valuable to the campaign," is a question of fact for the

---

[5] This becomes even more baffling considering, as explained in the preceding section, that the signature gathers quit before allegedly providing "inside information." It begs the question: what duties, if any, did the signature gatherers owe after the relationship was over?

trial. (R.113 at PageID 2598.) The Government misses the point. The question is not "why" the Ballot Campaign might have wanted to keep the signature count confidential; the question is whether the signature count was legally confidential business information. By every reasonable definition of that term, the signature count was not confidential.

The Government then pivots to a claim that somehow the signature count qualifies as an indistinct form of protected "intangible property." (R.113 at PageID 2598-99.) But the Government's reliance on *Carpenter*, R.113 at PageID 2598-99, is of no help because, as set forth above, the signature count was not confidential. Moreover, the Ballot Campaign was not in the business of selling signatures and neither the signatures nor the signature count were merchandise.

In *Carpenter*, the Court reasoned that the news matter at issue was no different than other types of *confidential business information* since it constituted the publisher's "stock in trade, to be gathered at the cost of enterprise, organization, skill, labor, and money, *and to be distributed and sold to those who will pay money for it, as for any other merchandise.*" *Id.* (citing *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 236 (1918) (emphasis added)).

While signatures on a petition may have been gathered at the Ballot Campaign's expense, the signed petitions (physical objects) are not what was allegedly sought here. Rather, it was information about the *number* of signatures gathered (*i.e.,* the signature count). And, while the Government alleges that information was of interest to Borges, "[i]t does not suffice … that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim." *Cleveland v. United States,* 531 U.S. 12, 15 (2000). The signature count was not property in the hands of the Ballot Campaign.

Neither the signed petitions nor the signature count could be transferred or sold for use in some other referendum. *See* Ohio Rev. Code § 3519.01(B). So, unlike the news matter at issue in *Carpenter*, the signature count was not merchandise in the hands of the Ballot Campaign because it could not be "distributed and sold to those who will pay money for it." Nor is the signature count like "a trademark, brand name, business strategy, or other product that [the Ballot Campaign] may trade or sell in the open market[,]" *Cleveland,* 531 U.S. at 24, nor like an unissued degree, *Frost,* 125 F.3d at 367, nor like an admissions slot at a university, *Khoury*, 2021 WL 2784835 at *5.

Furthermore, the Government focuses much of its argument on what it claims are the potential economic risks that could have been caused by disclosure of the signature count. (R.113 at PageID 2593, 2595, 2597-99.)[6] In doing so, the Government attempts to supplant one set of elements (breach of a fiduciary duty through bribery) with another (reasonably foreseeable economic harm). Stated differently, bribery, under the Government's theory, is a *quid pro quo* where the *quo* is anything that could cause potential economic harm because that would cause a conflict of interest.[7] This is simply an attempt to resuscitate the amorphous line of conflict-of-interest cases already rejected by the Supreme Court. *See Skilling* 561 U.S. at 409-10.

*****

The Government has no authority for the proposition that CHS-1 or the signature gatherers had a legal duty prohibiting the disclosure of non-confidential information (the

---

[6] As discussed above, even if reasonably foreseeable economic harm is an element of § 1346, it is not relevant to the issues presented in Borges' Motion.

[7] The Government's theory, if accepted, would sweep protected First Amendment speech within its ambit, such as whistleblowers who, by definition, disclose information that may cause foreseeable potential economic harm to the employer, or a former employee who shares unprotected information about an industry with a new employer, helping them increase market share and thus potentially harming their former employer.

signature count) because there was none. And the signature count is clearly not a species of protected intangible property. *See Cleveland*, 531 U.S. at 25 ("to the extent that the word 'property' is ambiguous as placed in § 1341," the Court applies the rule of lenity). The Government's theories about liability under § 1346 "leaves its outer boundaries ambiguous and involves the Federal Government setting standards" of fiduciary duties for private actors post hoc. *McNally v. United States,* 483 U.S. 350, 360 (1987). "But not every corrupt act" by a private actor is a federal crime. *Kelly v. United States,* 140 S. Ct. 1564, 1574 (2020). And the "federal fraud statutes are not catch-all laws designed to punish all acts of wrongdoing or dishonorable practices." *United States v. Connolly,* 24 F.4th 821, 834 (2nd Cir. 2022).[8]

Therefore, the allegations that purport to allege private-sector honest services fraud must be stricken from the indictment and the Government must be forbidden from attempting to introduce any evidence supporting that theory. Otherwise, the Government will confuse the jury with theories unsupported by law, irreparably prejudicing Borges.[9]

B. **Unconstitutional Application of the Travel Act**

Ohio Revised Code § 3517.22(A)(2) is broader than the generic definition of bribery because it prohibits more than an intent to improperly influence or discharge actions. (R.104

---

[8] In overturning convictions for alleged LIBOR rigging, the Second Circuit dismissed the testimony that the defendants' actions were "wrong" or "intuitively wrong," focusing instead on whether the elements of fraud were actually met. *Connolly,* 24 F.4th at 835-43.

[9] All of this is enough to question the motivations behind Borges' prosecution. Borges made national news for launching a SuperPAC to defeat President Trump in the 2020 election. *See e.g.* Karen Kasler, "Former Ohio GOP Chair Now Heading Group Working for Biden's Election," (June 17, 2020) available at https://www.statenews.org/government-politics/2020-06-17/former-ohio-gop-chair-now-heading-group-working-for-bidens-election. Less than a month later, he was arrested for his alleged involvement in this case. And, there has been extensive reporting on Trump's efforts to utilize the Justice Department to reward friends and exact revenge on those he perceived as political enemies. *See e.g.* Sarah Lynch, "Justice Department appears to be rewarding Trump allies, punishing enemies, legal experts say," (July 21, 2020) available at https://www.reuters.com/article/us-usa-trump-justice/justice-department-appears-to-be-rewarding-trump-allies-punishing-enemies-legal-experts-say-idUSKCN24M2NT.

at PageID 1750-51.) Therefore, § 3517.22(A)(2) is not a valid predicate for 18 U.S.C. § 1952 ("the Travel Act"). The Government's argument to the contrary is without merit.

The Government misreads the plain text of § 3517.22(A)(2). According to the Government, that statute "criminalizes *offering payment* (to private employees of the ballot campaign) *'for the purpose of influencing' their actions*, either 'with respect to the improper discharge of the employee's or agent's campaign duties' or 'to obtain information about the committee's campaign organization.'" (R.113 at PageID 2603-04.)  But that is a tortured and grammatically incorrect reading of the plain text of § 3517.22(A)(2) because it ignores the placement of a rather important comma.

Section 3517.22(A)(2) establishes that it is a violation of the statute for a person to, *inter alia*, "[p]romise, offer, or give any valuable thing or valuable benefit to any person who is employed by or is an agent of a committee in advocacy of or in opposition to the adoption of any ballot proposition or issue**,** for the purpose of influencing the employee or agent with respect to the improper discharge of the employee's or agent's campaign duties or to obtain information about the committee's campaign organization" (emphasis added to the comma of importance).

To understand the meaning of this passage it is necessary to parse the language. The subject (and independent clause) of subsection (A)(2) is the action that a person should "promise, offer, or give any valuable thing or valuable benefit to any person who is employed by or is an agent of a committee in advocacy of or in opposition to the adoption of any ballot proposition or issue." If (A)(2) had ended here, at the comma, it would have been complete, if overbroad. Combining clause (A) and the first portion of subclause (2) (before the comma), the statute would read: "No person during the course of any campaign in advocacy of or in opposition to the adoption of any proposition or issue submitted to the voters shall knowingly and with intent to affect the outcome of such campaign…[p]romise, offer, or give any valuable

thing or valuable benefit to any person who is employed by or is an agent of a committee in advocacy of or in opposition to the adoption of any ballot proposition or issue."

With the implicit judgement that this prohibition would be too strict, (A)(2) is modified with two dependent clauses, separated from the independent clause by the comma bolded above. The first dependent clause is "for the purpose of influencing the employee or agent with respect to the improper discharge of the employee's or agent's campaign duties." The second dependent clause, offered in the alternative, is "to obtain information about the committee's campaign organization." These distinct alternative dependent clauses make it clear that § 3517.22(A)(2) has two separate prohibitions.

The first prohibition is that "[n]o person during the course of any campaign in advocacy of or in opposition to the adoption of any proposition or issue submitted to the voters shall knowingly and with intent to affect the outcome of such campaign...[p]romise, offer, or give any valuable thing or valuable benefit to any person who is employed by or is an agent of a committee in advocacy of or in opposition to the adoption of any ballot proposition or issue...for the purpose of influencing the employee or agent with respect to the improper discharge of the employee's or agent's campaign duties." This is a form of generic bribery.

The second prohibition is that "[n]o person during the course of any campaign in advocacy of or in opposition to the adoption of any proposition or issue submitted to the voters shall knowingly and with intent to affect the outcome of such campaign...[p]romise, offer, or give any valuable thing or valuable benefit to any person who is employed by or is an agent of a committee in advocacy of or in opposition to the adoption of any ballot proposition or issue...to obtain information about the committee's campaign organization." This is not a form of generic bribery.

For the Government's interpretation of § 3517.22(A)(2) to have merit would require that the comma noted above be moved nine words down the sentence so as to read *"[n]o person*

*during the course of any campaign in advocacy of or in opposition to the adoption of any proposition or issue submitted to the voters shall knowingly and with intent to affect the outcome of such campaign…[p]romise, offer, or give any valuable thing or valuable benefit to any person who is employed by or is an agent of a committee in advocacy of or in opposition to the adoption of any ballot proposition or issue for the purpose of influencing the employee or agent**, with respect to the improper discharge of the employee's or agent's campaign duties or to obtain information about the committee's campaign organization*.*"* If the comma were moved as shown, then "for the purpose of influencing the employee or agent" would be part of the independent clause, and "with respect to the improper discharge of the employee's or agent's campaign duties" and "to obtain information about the committee's campaign organization" would be the alternative dependent clauses as urged by the Government. The placement of the comma in the enacted statute, however, forbids such an interpretation.

This means that one can violate § 3517.22(A)(2) in two ways. Either with the intent: (1) of influencing the employee or agent with respect the improper discharge of campaign duties *or* (2) to obtain information about the organization. The application of the Travel Act is limited to acts which fall within the generic term (bribery) used in the Travel Act. *United States v. Parlavecchio*, 903 F.Supp. 788, 792 (D.N.J. 1995) (citing *United States v. Nardello*, 393 U.S. 286, 296 (1969)). Because § 3517.22(A)(2) encompasses actions outside the scope of generic bribery, it is not a valid predicate for 18 U.S.C. § 1952.

Furthermore, the Government ignores the significance of the quasi-criminal nature of § 3517.22 in its argument rejecting any federalism concerns. (*Compare* R.113 at PageID 2604-05 *with* R.104 at PageID 1751-52.)

Section 3517.22 takes the extraordinary step, under Ohio law, of predicating any potential criminal enforcement upon a referral by the Ohio Elections Commission after a

thorough administrative process has been exhausted. *See* Ohio Rev. Code § 3517.22(C). The Ohio Legislature has, therefore, clearly decided that § 3517.22 is not a criminal offense that is subject to general police and prosecutorial enforcement. In other words, § 3517.22 is a quasi-criminal offense under Ohio law and it is the Ohio Elections Commission, not state or federal prosecutors, that determines whether § 3517.22 can be criminally enforced. *See e.g. Martin v. Ohio,* 480 U.S. 228, 232 (1987) (recognizing that "the preeminent role of the States in preventing and dealing with crime and the reluctance of the Court to disturb a State's decision with respect to the definition of criminal conduct and the procedures by which the criminal laws are to be enforced").

Because Congress enacted the Travel Act to aid states in the enforcement of their criminal laws, *Rewis v. United States,* 401 U.S. 808, 811 (1971), it would be contrary to that purpose for the Government to attempt to aid Ohio in the enforcement of this quasi-criminal law. *See Ferber,* 966 F. Supp. at 106.

### III.  Conclusion

For these reasons, the Court should grant Borges' Motion to Strike Prejudicial Surplusage from the Indictment.

Respectfully submitted,

*/s/ Karl H. Schneider*
Karl H. Schneider (0012881), Lead Counsel
Todd A. Long (0082296)
MCNEES WALLACE & NURICK LLC
21 East State Street, Suite 1700
Columbus, Ohio 43215
Telephone: (614) 719-2843
Facsimile: (614) 469-4653
kschneider@mcneeslaw.com
tlong@mcneeslaw.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Reply was electronically filed with the Clerk of the United States District Court using the CM/ECF system on March 8, 2022, which will send notification of such filing to all attorneys of record including Assistant United States Attorneys Emily Glatfelter and Matthew Singer.

*/s/ Karl H. Schneider*
Karl H. Schneider (0012881), Lead Counsel